UNITED STATES *v.* BUDD.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF WASHINGTON.

No. 1391. Argued February 1, 1892. — Decided March 28, 1892.

When, in a court of equity, it is proposed to set aside, annul or correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal and convincing, and not a bare preponderance of evidence; and this rule, well established in private litigations, has additional force when the object of the suit is to annul a patent issued by the United States.

The *Maxwell Land Grant Case*, 121 U. S. 325, is affirmed, and is quoted from and applied.

When the defendant in a suit in equity appears and answers under oath, denying specifically the frauds charged, no presumptions arise against him if he fails to offer himself as a witness as to the alleged frauds, inasmuch as the plaintiff can call him and cross-examine him.

"Public lands . . . valuable chiefly for timber, but unfit for cultivation," within the meaning of the timber and stone act of June 3, 1878, 20 Stat. 89, c. 151, include lands covered with timber but which may be made fit for cultivation by removing the timber and working the lands.

B. entered a quarter section of timber land in Washington under the act of June 3, 1878, 20 Stat. 89, c. 151, and after receiving a patent for it transferred it to M. M. purchased quite a number of lots of timber lands in that vicinity, the title to 21 of which was obtained from the government within a year by various parties, but with the same two witnesses in each case, the deeds to M. reciting only a nominal consideration. These purchases were made shortly after, or in some cases immediately before the payment to the government. B. and M. were both residents in Portland, Oregon. One of the two witnesses to the application was examining the lands in that vicinity and reporting to M. *Held,*

    (1) That all that the act of June 3, 1878, denounces is a prior agreement by which the patentee acts for another in the purchase;

    (2) That M. might rightfully go or send into that vicinity, and make known generally, or to individuals, a willingness to buy timber land at a price in excess of that which it would cost to obtain it from the government; and that a person knowing of that offer might rightfully go to the land office and purchase a timber lot from the government, and transfer it to M. for the stated excess, without violating the act of June 3, 1878.

THE court stated the case as follows.

On July 23, 1882, the defendant, David E. Budd, applied at the United States land office at Vancouver, Washington Territory, for the purchase as timber land of the southeast quarter of section 12, township 9, range 1 west, Willamette meridian. On November 10, 1882, he paid the purchase price, $2.50 per acre, and received the receiver's certificate, and on the 5th day of May, 1883, a patent was duly issued to him. On December 4, 1882, he conveyed the land to the other defendant, James B. Montgomery. His entry and purchase were made under the "timber and stone" act of June 3, 1878, 20 Stat. 89, c. 151. Section 1 of this act provides:

"That surveyed public lands . . . valuable chiefly for timber, but unfit for cultivation, and which have not been offered at public sale according to law may be sold . . . in quantities not exceeding one hundred and sixty acres to any one . . . at the minimum price of two dollars and

fifty cents per acre ; and lands valuable chiefly for stone may be sold on the same terms as timber lands."

Section 2, so far as it is applicable to the case at bar, is as follows :

" Sec. 2. That any person desiring to avail himself of the provisions of this act, shall file with the register of the proper district a written statement in duplicate, one of which is to be transmitted to the General Land Office, designating by legal subdivisions the particular tract of land he desires to purchase, setting forth that the same is unfit for cultivation and valuable chiefly for its timber or stone ; . . . that deponent has made no other application under this act; that he does not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit; and that he has not, directly or indirectly, made any agreement or contract, in any way or manner, with any person or persons whatsoever, by which the title which he might acquire from the government of the United States should enure, in whole or in part, to the benefit of any person except himself; which statement must be verified by the oath of the applicant before the register or the receiver of the land office within the district where the land is situated ; and if any person taking such oath shall swear falsely in the premises, he shall be subject to all the pains and penalties of perjury and shall forfeit the money which he may have paid for said lands and all right and title to the same ; and any grant or conveyance which he may have made, except in the hands of *bona fide* purchasers, shall be null and void."

The third section of said act, so far as here applicable, is as follows :

" Sec. 3. That upon the filing of said statement . . . the register of the land office shall post a notice of such application, embracing a description of the land by legal subdivisions, in his office, for a period of sixty days, and shall furnish the applicant a copy of the same for publication, at the expense of such applicant, in a newspaper published nearest the location of the premises for a like period of time; and after the expiration of said sixty days, if no adverse claim shall

have been filed, the person desiring to purchase shall furnish to the register of the land office satisfactory evidence, first, that said notice of the application prepared by the register as aforesaid was duly published in a newspaper as herein required; secondly, that the land is of the character contemplated in this act, . ... . and upon payment to the proper officer of the purchase money of said land, together with the fees of the register and the receiver, as provided for in case of mining claims in the twelfth section of the act approved May tenth, eighteen hundred and seventy-two, the applicant may be permitted to enter said tract, and, on the transmission to the General Land Office of the papers and testimony in the case, a patent shall issue thereon."

. On March 15, 1886, the government filed this bill in the District Court of the Second Judicial District of Washington Territory, making Budd the patentee and Montgomery his grantee parties defendant, the purpose of which was to set aside the patent and the title by it conveyed, on the ground that the land was not timber land within the meaning of the act, and that the title to it was obtained wrongfully and fraudulently, and in defiance of the restrictions of the statute. The defendants appeared and answered under oath denying the charges, proofs were taken, and on final hearing a decree was entered in their favor dismissing the bill, 43 Fed. Rep. 630, from which decree the United States appealed to this court.

*Mr. Assistant Attorney General Parker* for appellant.

The two principal questions arising in the case are:

First. Is there such a combination or conspiracy shown to have existed to obtain this, or this and other timber lands for the defendant, Montgomery, as authorizes the annulment of the patent issued to defendant Budd?

Second. Is land of the character and description of this quarter section subject to entry and purchase under the " timber and stone act " of 1878?

I. The evidence shows that the lands in controversy, with

other lands were entered under the act of 1878, as part of a project then existing to transfer the title from the United States to Montgomery.

James B. Montgomery and Edward W. Bingham of Multnomah County, Oregon, made, respectively, August 21, 1882, timber entries under the act of 1878 upon portions of said township No. 9, the witnesses in each case being George F. White and George W. Taylor. The acknowledgment of all the deeds mentioned in the schedule as running to defendant Montgomery took place in Multnomah County, Oregon, and in all cases but two the acknowledgments were before E. W. Bingham, or Ed. W. Bingham, as the notarial officer. All of the lands mentioned in the schedule, except the lot deeded to Montgomery by William D. O'Regan, are portions of township No. 9, and said Regan lot is a portion of township No. 10.

The following is a schedule of lands obtained under the act of 1878, in the names of divers individuals specified, and conveyed by deed to defendant Montgomery as shown by the record. All these individuals except Harmans, Mangs and Taylor are stated to be residents of Multnomah County, Oregon.

| Name. | Date of statement under act. | Names of witnesses. | Date of payment to U. S. | Date of deed to Montgomery. |
|---|---|---|---|---|
| David E. Budd | 1882. Aug. 23 | George F. White and Robert Rockwell. | 1882. Nov. 10 | 1882. Dec. 4 |
| John W. Steffen | " | " | " | 1883. Feb. 27 |
| Alvin B. Hastings | " | " | " | 1882. Nov. 17 |
| Charles C. Carnell | " | " | " | Dec. 11 |
| Charles H. Harmans | Sept. 29 | " | Dec. 13 | Dec. 15 |
| John Mangs | " | " | " | " |
| George W. Taylor | " | " | Dec. 14 | Dec. 13 |
| Allen A. Unkless | 1883. Jan. 10 | " | 1883. Mar. 17 | 1883. May 1 |
| James K. Misner | " | " | " | " |
| George M. Misner | " | " | " | " |

| Name. | Date of statement under act. | Name of witnesses. | Date of payment to U. S. | Date of deed to Montgomery. |
|---|---|---|---|---|
| Hamilton Knott | Mar. 24 | " | June 2 | June 27 |
| Zeba M. LaRue | " | " | " | June 14 |
| James L. Jewett | " | " | " | June 27 |
| William A. Freeman | Mar. 22 | " | June 15 | June 22 |
| Michael H. McManus | " | " | June 16 | June 26 |
| Mark Woods | " | " | " | June 23 |
| Alexander Lothian | " | " | " | " |
| Robert Dooling | Mar. 27 | " | " | " |
| Joseph Hughs | " | " | " | " |
| William D. O'Regan | Mar. 22 | " | June 20 | June 27 |
| Joseph J. Meagher | Mar. 28 | " | " | " |
| Martin Conroy | Apr. 16 | Nicholas Klein and Alexander Miller. | July 2 | June 26 |

The land in question is west of the Cascade Mountains, and is about a mile and a half from Silver Lake, or Toutle Lake, as the same is called on government maps.

Budd and Montgomery were both residents of Portland, Oregon.

Budd carried on a stock stable there.

In September, 1885, Budd said to the United States special agent of the General Land Office (witness Mundy) that he had taken up the land for his own benefit; that he had not sold it to anybody, but still held it; that he was not sure he had ever seen this tract of land, but he had once gone to the neighborhood for that purpose; said that the land was " in soak."

Witness Mundy claims that defendant Montgomery had caused to be entered of the timber lands around Silver Lake over 10,000 acres.

It will be noted that Budd paid for the land $2.50 per acre; and that his deed to Montgomery shows its conveyance for a nominal sum, while the affidavit of value upon this appeal shows it to be worth $5000, or over $31 per acre. It is respectfully submitted that the obtaining of timber lands thus shown is in contravention of the spirit and the letter of the act of June 3, 1878.

It will be noted that Montgomery, Budd, White, Rockwell and Bingham all fail to take the witness stand, and refrain from making any denial or explanation of the charges and inferences arising against them upon the trial.

Budd did not know that he had ever seen the land, while Montgomery was active in contending for the titles which he was securing.

While the proofs of conspiracy and combination involving the two defendants is not so direct and full as a complainant might desire to establish, it is yet believed that the judicial judgment upon the facts shown may fairly be that the obtaining of the lands by Montgomery, as shown in the record, including the Budd tract, was in contravention of the provisions of the "timber and stone act," and that the patent and deed now assailed should be declared void.

II. The land is not of a description which can be disposed of under this act, because not chiefly valuable for timber or stone, and unfit for cultivation, but is valuable for agricultural purposes, and the defendant Budd, in making his proof in the land office, procured the giving of false testimony as to the character of the land in this respect.

*Mr. Jefferson Chandler* for appellees.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

In the brief of counsel for the government it is stated that "the two principal questions arising in the case are: First. Is there such a combination or conspiracy shown to have existed to obtain this, or this and other timber lands for the defendant Montgomery, as authorizes the annulment of the patent issued to defendant Budd? Second. Is land of the character and description of this quarter section subject to entry and purchase under the 'timber and stone act' of 1878?"

The first question is, perhaps, stated too broadly, for the inquiry is necessarily limited to the land in controversy. If its title was fairly acquired, it matters not what wrongs have

been done by either defendant in acquiring other lands; so the question properly to be considered is, was this land wrongfully and fraudulently obtained from the government? We have had many cases of this nature before us, and the rules to guide in its determination have been fully settled. *Kansas City, Lawrence &c. Railroad* v. *Attorney General,* 118 U. S. 682; *Maxwell Land Grant Case,* 121 U. S. 325, 381; *Colorado Coal Co.* v. *United States,* 123 U. S. 307; *United States* v. *Des Moines Navigation &c. Co.,* 142 U. S. 510.

In the second of these cases Mr. Justice Miller thus clearly states the rule:

"We take the general doctrine to be, that when in a court of equity it is proposed to set aside, to annul or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt. If the proposition, as thus laid down in the cases cited, is sound in regard to the ordinary contracts of private individuals, how much more should it be observed where the attempt is to annul the grants, the patents and other solemn evidences of title emanating from the government of the United States under its official seal. In this class of cases, the respect due to a patent, the presumptions that all the preceding steps required by the law had been observed before its issue, the immense importance and necessity of the stability of titles dependent upon these official instruments, demand that the effort to set them aside, to annul them, or to correct mistakes in them, should only be successful when the allegations on which this is attempted are clearly stated and fully sustained by proof. It is not to be admitted that the titles by which so much property in this country and so many rights are held, purporting to emanate from the authoritative action of the officers of the government, and, as in this case, under the seal and signature of the President of the United States himself, shall be dependent upon the hazard of successful resistance to the whims and caprices of every person who chooses to attack them in a

court of justice; but it should be well understood that only that class of evidence which commands respect, and that amount of it which produces conviction, shall make such an attempt successful."

This case is even stronger in its aspects than some that have been before us, for if the particular wrong charged upon the defendants be established the money paid is, by the second section of the act, forfeited, and there is not even the possibility suggested in the case of *United States* v. *Trinidad Coal Co.*, 137 U. S. 160, of an equitable claim upon the government for its subsequent repayment. The hardship of such a result, so different from that which is always enforced in suits between individuals, makes it imperative that no decree should pass against the defendants unless the wrong be clearly and fully established.

The particular charge is, that Budd, before his application, had unlawfully and fraudulently made an agreement with his co-defendant, Montgomery, by which the title he was to acquire from the United States should enure to the benefit of such co-defendant. Upon this question, the fact that stands out prominently is, that there is no direct testimony that Budd made any agreement with Montgomery, or even that they ever met, or either knew of the existence of the other, until after Budd had fully paid for the land. No witness ever knew or heard of any agreement. What, then, is the evidence upon which the government relies? It appears that Montgomery purchased quite a number of tracts of timber lands in that vicinity, some ten thousand acres, as claimed by one of the witnesses; that the title to twenty-one of these tracts was obtained from the government within a year, by various parties, but with the same two witnesses to the application in each case; that the purchases by Montgomery were made shortly after the payment to the government, and in two instances a day or so before such payment; that these various deeds recite only a nominal consideration of one dollar; that Budd and Montgomery were residents of the same city, Portland, Oregon; that one of the two witnesses to these applications was examining the lands in that vicinity and reporting

to Montgomery; and that the patentee, Budd, years after his conveyance to Montgomery, stated to a government agent who was making inquiry into the transaction that he still held the land and had not sold it, but that it was "in soak." But surely this amounts to little or nothing. It simply shows that Montgomery wanted to purchase a large body of timber lands, and did purchase them. This was perfectly legitimate, and implies or suggests no wrong. The act does not in any respect limit the dominion which the purchaser has over the land after its purchase from the government, or restrict in the slightest his power of alienation. All that it denounces is a prior agreement, the acting for another in the purchase. If when the title passes from the government no one save the purchaser has any claim upon it, or any contract or agreement for it, the act is satisfied. Montgomery might rightfully go or send into that vicinity and make known generally, or to individuals, a willingness to buy timber land at a price in excess of that which it would cost to obtain it from the government; and any person knowing of that offer might rightfully go to the land office and make application and purchase a timber tract from the government, and the facts above stated point as naturally to such a state of affairs as to a violation of the law by definite agreement prior to any purchase from the government — point to it even more naturally, for no man is presumed to do wrong or to violate the law, and every man is presumed to know the law. And in this respect the case does not rest on presumptions, for the testimony shows that Montgomery knew the statutory limitations concerning the acquisition of such lands, and the penalties attached to any previous arrangement with the patentee for their purchase. Nor is this a case in which one particular tract was the special object of desire, and in which therefore it might be presumed that many things would be risked in order to obtain it; for it is clear from the testimony that not the land but the timber was Montgomery's object, and any tract bearing the quality and quantity of timber (and there were many such tracts in that vicinity) satisfied his purpose. This is evident, among other things, from the testimony of one Tipperry, upon which some reliance is placed

by the government, which was that Montgomery offered him one hundred dollars besides all his expenses if he would take a timber claim in that vicinity (no particular tract being named) and afterwards sell to him.   The government relies also on the testimony of Edward J. Searls, that Montgomery promised to give him $125, and all costs and expenses, if he would enter a tract of timber land and convey to him, and that thereafter Montgomery advanced the money for the payment to the government, and subsequently, on receipt of a deed, paid him the $125.   If it be conceded that this testimony as to another transaction be competent in this case, and there be put upon the testimony the worst possible construction against Montgomery, to the effect that he made a distinct and positive agreement with Searls for the purchase of a tract which the latter was to enter and obtain from the government, and so a transaction within the exact denunciation of the statute, still that testimony only casts suspicion on the transaction in question here, and suggests the possibility of wrong in it.   Because a party has done wrong at one time and in one transaction, it does not necessarily follow that he has done like wrong at other times and in other transactions.   Suppose in each of the twenty-one cases specified in the testimony the government had filed a separate bill making the patentee and Montgomery parties defendant, and charging in each, as here, a prior unlawful agreement, and in twenty of them the patentee and Montgomery had each answered, denying under oath any prior agreement, while in the twenty-first they had likewise answered, admitting in full as charged the making of such an unlawful agreement, would the admission in the one case be adjudged, in the face of the denial under oath in the other twenty, clear, full and convincing proof that in those cases likewise there was a prior, unlawful agreement?   And yet such admission of both patentee and Montgomery would be stronger and more satisfactory evidence than the separate testimony of the patentee.   And this is all the testimony which in any manner points to wrong in this transaction.   Surely this does not come up to the rule so-well established, as to the necessary proof in a case like this.

But it is suggested that there is a presumption of law that, where it appears that a transaction is wholly within the knowledge of one party to a suit, and he fails to disclose fully the facts concerning such transaction, it was of the character claimed by the adverse party. But that proposition has no application here. The charge is that Budd made a prior agreement with Montgomery. When Budd made his application he filed an affidavit swearing that he had made no agreement with any one. This is one denial under oath of the truth of this charge. In the bill as filed answers under oath were called for, and Budd and Montgomery each filed an answer under oath denying specifically the existence of any such prior agreement; and an answer under oath in an equity case, when called for, is to be taken as evidence. But it is said that neither one of the defendants appeared as a witness, nor did the notary who took the acknowledgment of Budd's deed to Montgomery, nor did White or Rockwell, the two witnesses to the application of Budd for purchase of the land. As no wrong is charged against the three latter, if the government, the complaining party, failed to call them, it is to be presumed that, upon inquiry, it found that they knew nothing which would tend to substantiate its claim. With regard to the two defendants, they having once sworn that there was no agreement, there was nothing farther to disclose. If the government doubted their statements under oath, it could have called either one and cross-examined him to its satisfaction. It is familiar law that where a witness discloses in his testimony that he is adverse in interest and feeling to the party calling him, the latter may change the character of his examination from a direct to a cross-examination, and the opposing party is always adverse in interest. In *Clarke* v. *Saffery*, Ryan & Moody, 126, in which the plaintiff's counsel called the defendant as his own witness and sought to cross-examine him, Chief Justice Best said: "If a witness, by his conduct in the box, shows himself decidedly adverse, it is always in the discretion of the judge to allow a cross-examination; but if a witness called, stands in a situation which of necessity makes him adverse to the party calling him, as in

the case here, the counsel may, as matter of right, cross-examine him." See also *People* v. *Mather*, 4 Wend. 229; *Bank of Northern Liberties* v. *Davis*, 6 W. & S. 285; *Towns* v. *Alford*, 2 Alabama, 378. The government failed in this case to exercise such right of cross-examination, and surely cannot now be permitted to make its failure a basis of impeaching their sworn statements. Indeed, in view of the meagreness of this testimony, it is not to be wondered at that the counsel for the government could conscientiously make no stronger claim than this:

"While the proofs of conspiracy and combination involving the two defendants are not so direct and full as a complainant might desire to establish, it is yet believed that the judicial judgment upon the facts shown may fairly be that the obtaining of the lands by Montgomery, as shown in the record, including the Budd tract, was in contravention of the provisions of the 'timber and stone act,' and that the patent and deed now assailed should be declared void."

With regard to the second question: The description in the act is of lands "valuable chiefly for timber, but unfit for cultivation." It is conceded that these lands were valuable chiefly for timber. It is claimed, however, that they were fit for cultivation, and therefore not within the description of lands purchasable under this act. But obviously at the time of the purchase the land was unfit for cultivation. It was covered with a dense growth of timber; fir trees, many of them two hundred feet in height and five feet in diameter. In respect to the testimony the trial court makes this comment:

"Thirteen witnesses were called who testified that the soil is stony and inferior for farming purposes; that it contains excellent fir and cedar timber, besides hemlock and an undergrowth of various shrubs and brush; that the trees are large, tall and straight, and sound, and will yield from 50,000 to 150,000 feet of the best quality of lumber per acre, and this testimony and estimate are not controverted. The field-notes made by the government survey or at the time of surveying the land, more than twenty-five years ago, describe the land

as being stony and second-rate, and the timber as fir, cedar and hemlock, and the most convincing testimony of all is a series of twelve photographs taken near the centres of each legal subdivision of the tract. These pictures exhibit, with unerring certainty and faithfulness, magnificent trees standing so near together as to force each other to grow straight and tall. They satisfy the court that this tract is valuable and desirable for the timber upon it, and also that no man would be willing to subjugate this piece of forest for the mere sake of cultivating it."

If it be suggested that this dense forest might be cleared off and then the land become suitable for cultivation, the reply is, that the statute does not contemplate what may be, but what is. Lands are not excluded by the scope of the act because in the future, by large expenditures of money and labor, they may be rendered suitable for cultivation. It is enough that at the time of the purchase they are not, in their then condition, fit therefor. The statute does not refer to the probabilities of the future, but to the facts of the present. Many rocky hill-slopes or stony fields in New England have been, by patient years of gathering up and removing the stones, made fair farming land; but surely no one before the commencement of these labors would have called them fit for cultivation. We do not mean that the mere existence of timber on land brings it within the scope of the act. The significant word in the statute is "chiefly." Trees growing on a tract may be so few in number or so small in size as to be easily cleared off, or not seriously to affect its present and general fitness for cultivation. So, on the other hand, where a tract is mainly covered with a dense forest, there may be small openings scattered through it susceptible of cultivation. The chief value of the land must be its timber, and that timber must be so extensive and so dense as to render the tract as a whole, in its present state, substantially unfit for cultivation.

But after all, the question is not so much one of law for the courts after the issue of the patent, as of fact, in the first instance, for the determination of the land officers. The courts

do not revise their determination upon a mere question of fact. In the absence of fraud or some other element to invoke the jurisdiction and powers of a court of equity, the determination of the land officers as to the fact whether the given tract is or is not fit for cultivation, is conclusive. There is, in such cases, no general appeal from the land officers to the courts, and especially after the title has passed, and the money been paid. We do not, however, need to rest upon this proposition in this case, for the testimony clearly shows that the tract as a whole was not fit for cultivation, but was valuable chiefly for its timber.

We see no error in the rulings of the trial court, and its decree will be .

*Affirmed.*

Mr. Justice Brown, with whom concurred Mr. Justice Harlan, dissenting.

Mr. Justice Harlan and myself agree with the majority of the court in its construction of the timber and stone act of June, 1878, that it provides for the sale of lands valuable chiefly for timber, but unfit, *at the time of such sale*, for cultivation. From so much of the opinion, however, as holds that the purchase of these lands by the defendant Montgomery was *bona fide*, we are constrained to dissent.

The object of the act in question was to authorize the sale of timbered lands in lots not exceeding 160 acres to any one person, at a minimum price of $2.50 per acre ; and, in furtherance of this object, it was provided in section 2, that the applicant must make oath that he has made no other application under the act ; that he does not apply to purchase the same on speculation, but in good faith to appropriate it to his own exclusive use and benefit ; and that he has not, directly or indirectly, made any agreement or contract in any way or manner with any person or persons whatsoever, by which the title he might acquire from the government of the United States should enure, in whole or in part, to the benefit of any person except himself.

.The facts in regard to this particular entry are meagre. It appears that Budd and Montgomery were both residents of Portland, Oregon, and that Budd carried on a stock stable there; that he entered the land on August 23, 1882, paid for it on November 10, and conveyed it to defendant Montgomery on December 4, for a nominal consideration of $1. Nearly three years thereafter he stated to a special agent of the land office that he had taken up the land for his own benefit; that he had not sold it to anybody, but still held it, (a statement manifestly untrue;) that he was not sure that he had ever seen the tract, but had once gone into the neighborhood for that purpose; and that the land was in " soak," whatever that may mean. He refused to make an affidavit, but said he would make a statement. The tract for which he paid $2.50 per acre is shown to be worth $5000, or over $31 per acre.

Did the case rest upon this statement alone, it must be conceded that the government had not proven enough to authorize an annulment of the patent subsequently issued. But it is a familiar rule that where a particular act is equivocal in its nature, and may have been done with fraudulent intent, proof of other acts of a similar nature done contemporaneously or about the same time are admissible to show such intent. Cases of fraud are recognized exceptions to the general rule that the commission of one wrongful act has no legal tendency to prove the commission of another. Such other acts always have a bearing upon the questions of fraudulent intent or guilty knowledge where they are in issue. Thus, a single act of passing counterfeit money is very little, if any, evidence that the party knew it was counterfeit, since the innocent passing of such money is an every-day occurrence; but if it be shown that the person accused made other attempts to pass the money at or about the same time, or that he had other counterfeit money in his possession, the proof of scienter is complete. The same rule is frequently invoked in cases of alleged frauds upon the government. It was applied by this court in *Castle* v. *Bullard*, 23 How. 172, to a case where the defendants were charged with having fraudulently sold the goods of the plaintiff; in *Lincoln* v. *Claflin*, 7 Wall. 132, to an

action for fraudulently obtaining property; and in *Butler* v. *Watkins*, 13 Wall. 456, to an action for deceit in endeavoring to prevent a patentee from using his invention. The authorities are fully reviewed in *New York Mut. Life Ins. Co.* v. *Armstrong*, 117 U. S. 591, a case where a policy of life insurance was alleged to have been obtained for the purpose of cheating and defrauding the insurance company, and evidence was admitted that policies in other companies had been obtained with like intent.

In this connection the evidence shows that, in addition to Budd, there were twenty-one others, who within the next few months entered and paid for similar tracts of land, and within a few days thereafter conveyed them to the defendant Montgomery for the nominal consideration of $1. In two instances the land was deeded before the payment to the government. Thus of four entries and payments November 10, deeds were in all, except one instance, executed prior to December 15; of three entries in December, deeds were made within two days in two cases, and the day before the payment in the other; of three payments on March 17, for entries previously made, deeds were executed upon May 1; of eleven payments in June deeds were all made before the end of the month; and of one payment made July 2, a deed was executed June 26. In all these cases except one the entries were witnessed by George F. White and George W. Taylor, White being an agent of Montgomery for examining timber lands. All of the lands covered by these twenty-two entries lie in the same township, except one, which lies in an adjoining township. In all the cases but two the acknowledgments were made before the same notarial officer. The deeds thus executed to Montgomery covered over 3000 acres, and, if valued on the basis of the valuation of the Budd land, would amount to about $100,000. Two witnesses swore that, in 1882, Montgomery requested them to take a timber claim, and offered to pay them $100 each for their rights and expenses.

These facts, with certain others stated in the opinion of the court, constituted the case of the government. While, if these facts stood alone, without opportunity for further ex-

planation, it might be open to argument whether they estab-lished such a case of want of good faith as to call upon this court to annul the patents, we are clearly of the opinion that they are of such a nature as to call upon the defendants to produce the testimony within their reach to explain the suspicious circumstances attending these entries. As the case stands, the inference seems to us unavoidable, either that Montgomery bargained for these lands beforehand, or that he was most singularly fortunate in being able to purchase them so soon after their entry. Neither Budd nor Montgomery, nor their witnesses White and Rockwell, were put upon the stand, though all, or at least, some of them, must have been cognizant of the entire facts connected with these transactions. "It is certainly a maxim," said Lord Mansfield, "that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted." *Blatch* v. *Archer,* Cowp. 63, 65. It has always been held that the omission of a party to testify as to facts in his knowledge in explanation of, or to contradict, adverse testimony is a proper subject for consideration both at law and in equity. *McDonough* v. *O'Neil,* 113 Mass. 92. The rule was thus stated by Chief Justice Shaw in the celebrated case of *Commonwealth* v. *Webster,* 5 Cush. 295, 316: "Where probable proof is brought of a state of facts tending to criminate the accused, the absence of evidence tending to a contrary conclusion is to be considered — though not alone entitled to much weight; because the burden of proof lies on the accuser to make out the whole case by substantive evidence. But when pretty stringent proof of circumstances is produced, tending to support the charge, and it is apparent that the accused is so situated that he could offer evidence of all the facts and circumstances as they existed, and show, if such was the truth, that the suspicious circumstances can be accounted for consistently with his innocence, and he fails to offer such proof, the natural conclusion is, that the proof, if produced, instead of rebutting, would tend to sustain the charge."

It is said by Mr. Starkie in his work on Evidence, vol. 1,

page 54: " The conduct of the party in omitting to produce that evidence in elucidation of the subject matter in dispute, which is within his power, and which rests peculiarly within his own knowledge, frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence if adduced would operate to his prejudice." The same rule is applicable even in criminal proceedings. 3 Starkie, 1253; see also 2 Pothier on Obligations, 340.

It is said, however, in excuse, that, when Budd made his application, he filed an affidavit that he had made no agreement with any one; and that Budd and Montgomery each filed an answer under oath denying specifically any such prior agreement. This, however, answers but poorly for the testimony which these witnesses could give upon the stand. Our experience with human nature teaches us that men who are guilty of a transaction of this kind will not hesitate to put upon file a formal denial of their bad faith, and we hazard nothing in saying that the first impulse of an innocent man under such circumstances would be to offer himself as a witness in his own behalf and vindicate his own conduct in the transaction. It is true that the government was at liberty to call upon these witnesses, but in so doing it would make them its own, vouch for their veracity and integrity, be bound by their statements, and be denied, except in the discretion of the court, the right of cross-examination, which is the one thing indispensable to bring out the facts as they actually existed. Even if the right of cross-examination be conceded, we do not understand that it changes in any way the obligation of the defendants to produce such explanatory testimony as is within their control. While it is true that from the fact that a person has been guilty of fraud in one transaction, it is not necessarily implied that he has been guilty of it in another, the probability of a fraudulent intent is very greatly increased by the multiplication of transactions of a similar nature.

The evidence in this case tends to show that defendant Montgomery had, by this and other devices, appropriated to himself over ten thousand acres of land in and about this neighborhood. It is unnecessary to say that, however this

may have been done, it is a practical defeat of the intention of Congress. It certainly demands, and in this instance seems to have received, a searching investigation. When we see the most valuable portion of an immense domain, which has been reserved by the beneficence of Congress for the benefit of actual settlers, or of small proprietors, being gradually absorbed by a few speculators, we are forced to inquire whether there is not a limit beyond which even a land patent of the United States begins to lose something of its sanctity.

We think the decree of the court below dismissing the bill should be reversed.