## UNITED STATES v. HYDE et al.

(Circuit Court, W. D. Washington, W. D. November 15, 1909.)

No. 1,127.

1. PUBLIC LANDS (§ 138*)—TRANSFER OF RIGHTS—CONVEYANCE OF FOREST RESERVE LANDS TO UNITED STATES—TRANSFER BY GRANTOR OF RIGHT TO LIEU LAND.

Act June 4, 1897, c. 2, 30 Stat. 36 (U. S. Comp. St. 1901, p. 1541), which authorizes the owner of patented lands within a forest reservation to convey the same to the United States and select a tract of vacant public land of equal area in lieu thereof, contains nothing which either expressly or inferentially would prevent an owner who has so conveyed his land to the United States from executing an instrument which would operate to pass to another such title as he might thereafter acquire to lieu lands selected by him; and a grantee in such an instrument, who purchases and pays for the same in good faith after his grantor has made his selection, although before its approval, on such approval and the issuance of a patent, acquires the title as a bona fide purchaser and is entitled to protection as such.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 138.*]

2. PUBLIC LANDS (§ 138*)—PATENTS—RIGHT OF UNITED STATES TO CANCELLATION—BONA FIDE PURCHASERS.

The United States is not entitled to the cancellation in equity of a patent issued for lieu lands in exchange for land in a forest reservation conveyed to it by the patentee under the provisions of Act June 4, 1897, c. 2, 30 Stat. 36 (U. S. Comp. St. 1901, p. 1541), on the ground that title to such base land was fraudulently acquired from a state, where the patented land has passed into the hands of a bona fide purchaser from the patentee, who had no knowledge of the fraud.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 368; Dec. Dig. § 138.*

Bona fide purchasers, see note to United States v. Detroit Timber & Lumber Co., 67 C. C. A. 13.]

In Equity. Suit by the United States against Frederick A. Hyde and others. Decree for defendants.

Elmer E. Todd, U. S. Dist. Atty.

H. S. Griggs, for defendants Sawyer and Truxbury.

DONWORTH, District Judge. This suit is brought to set aside a patent issued July 22, 1902, to F. A. Hyde & Co., a California corporation, conveying the N. E. ¼ of section 24, in township 11 N., of range 4 E. of the Willamette meridian, situated in Lewis county, Wash. The patent was issued under the following statutory provisions:

"That in cases in which a tract covered by an unperfected bona fide claim or by a patent is included within the limits of a public forest reservation, the settler or owner thereof, may, if he desires to do so, relinquish the tract to the government, and may select in lieu thereof a tract of vacant land open to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

settlement not exceeding in area the tract covered by his claim or patent; and no charge shall be made in such cases for making the entry of record or issuing the patent to cover the tract selected: Provided further, that in cases of imperfected claims the requirements of the laws respecting settlement, residence, improvements, and so forth, are complied with on the new claims, credit being allowed for the time spent on the relinquished claims." Act June 4, 1897, c. 2, 30 Stat. 36 (U. S. Comp. St. 1901, p. 1541).

Under this statute the Secretary of the Interior established certain rules or regulations for its administration. Of these, rules 16 and 18 are as follows:

"16. Where final certificate or patent has issued, it will be necessary for the entryman or owner thereunder to execute a quitclaim deed to the United States, have the same recorded on the county records, and furnish an abstract of title, duly authenticated, showing chain of title from the government back again to the United States. The abstract of title should accompany the application for change of entry, which must be filed as required by paragraph 15, without the affidavit therein called for."

"18. All applications for change of entry or settlement must be forwarded by the local officers to the Commissioner of the General Land Office for consideration, together with report as to the status of the tract applied for."

The base land, of which a conveyance was made to the United States for the purpose of selecting the land now in question, consisted of a quarter section in the Pine Mountain and Zaca Lake Forest Reserve in California, described as the S. E. ¼ of section 36, township 6 N., range 26 W. of the San Bernardino meridian. For convenience I will hereafter refer to that section merely as "section 36." The bill was filed October 17, 1905, and names as defendants, Frederick A. Hyde, John A. Benson, F. A. Hyde & Co., a corporation, Alfred C. Truxbury and wife, and W. H. Sawyer and wife.

The evidence shows the facts to be as follows:

In the year 1898 A. J. Stein was a barber doing business in San Francisco. F. A. Hyde was one of his customers. Some time before March 3d of that year Hyde asked Stein if he had any friends that would like to take up land. Stein answered that he thought he could get them. Hyde asked him if he could get 10, and he said he thought so. Stein thereupon arranged with a number of friends, relations, and acquaintances, about 10 altogether, to sign such papers as Hyde should request. Hyde paid Stein about $20 for his entire services, and paid the men who did the signing from $10 to $12.50 each. One of the men whom Stein procured was William Schlipf, a neighbor. Schlipf went to a notary's office and signed some papers, the nature of which he does not remember. He did not read them and took no interest in the transactions. He signed several papers on different occasions, and perhaps a year or two elapsed between the signings. The record evidence shows that on March 3, 1898, Schlipf signed an application to purchase all of section 36, stating therein, among other things:

"That I desire to purchase the same for my own use and benefit, and for the use or benefit of no other person or persons whomsoever, and that I have made no contract or agreement to sell the same."

This application was sworn to by Schlipf, and was filed in the office of the state surveyor general of California on March 5, 1898, to-

gether with a power of attorney from Schlipf, authorizing Hyde to file the application and to receive the certificate. On August 22, 1898, the surveyor general approved the application and directed that the land be sold in accordance therewith, and on October 17th following a certificate of purchase was duly issued by the register of the state land office, declaring Schlipf to be the purchaser of section 36 and entitled to a patent on completing payment of the balance of the purchase price, which was at the rate of $1.25 an acre. In the office of the recorder of Santa Barbara county, Cal., there was filed at the request of Hyde on August 4, 1899, an assignment of the certificate of purchase and a deed from Schlipf to Hyde conveying all of section 36; both instruments bearing date October 26, 1898, and appearing to have been acknowledged by Schlipf that day. On February 12, 1900, formal patent in the usual form was issued by the state of California to Hyde as grantee, conveying section 36. Schlipf did not pay any part of the state's price for the land ($800), and the whole amount must have been paid by Hyde. On February 24, 1900, Hyde and wife by quitclaim deed conveyed section 36 to F. A. Hyde & Co., a California corporation. This deed and the patent were filed for record with the county recorder on March 15, 1900. The articles of incorporation of F. A. Hyde & Co. are in evidence, and thereby it appears that at the time of incorporation Hyde owned 996 of the 1,000 shares constituting the capital stock. On March 2, 1900, there were filed for record with the county recorder a number of quitclaim deeds in due form from F. A. Hyde & Co. to the United States, all dated and acknowledged February 27, 1900, two of which conveyed, respectively, the N. ½ and the S. ½ of the S. E. ¼ of section 36, aggregating 160 acres. These conveyances were evidently made for the purpose of serving as a base, under the statute and regulations, for the selection of lieu lands outside of the forest reservation. The genuineness of the signatures purporting to be made by Schlipf on some of the papers is questioned by complainants; but I see no reason to doubt that whatever purports to bear his signature was in fact signed by him.

This was the situation of affairs at the time that defendants Sawyer and Truxbury became connected with the subject-matter of this suit. They reside, respectively, at Worcester, Mass., and North Tonawanda, N. Y., and are lumbermen of mature age and large experience, owning timber lands in different parts of the country. They together visited Puget Sound in 1899, with a view of considering the advisability of investing in timber lands. In Tacoma they made the acquaintance of Angus McDougall, a timber cruiser there residing. They arranged that McDougall should buy timber lands for them in Lewis county and vicinity, and shortly after sent out Chas. Hill as their financial and business representative to act for them in making the purchases. The original idea was to buy from private owners; but while Truxbury and Sawyer were on the ground they were informed in a general way of the law permitting the exchange of lands within forest reservations for vacant land in the public domain, and learned that parties who had surrendered lands in forest reservations were offering their rights for sale. These rights were commonly spoken of as "forest reserve

scrip." Hill came to the state of Washington early in 1900, and, acting with McDougall, acquired altogether for Truxbury and Sawyer about 12,000 acres of timber land in Lewis and Cowlitz counties. Of this about 5,000 acres were acquired from the United States by means of lieu selections. "Forest reserve scrip" was at that time offered for sale by numerous parties, including railroad companies, individuals, and private corporations. Hill obtained price quotations from a number of these. He met Benson at Tacoma in February, and had some negotiations with him. At Benson's suggestion Hill took up the matter with Hyde by correspondence, addressed to the latter at San Francisco. This resulted in the purchase of a quantity of rights by Hill from F. A. Hyde & Co. Hill returned east by way of San Francisco, where he met Hyde and bought more. Between 4,000 and 5,000 acres of rights were bought in this way from F. A. Hyde & Co. The price paid ranged from $3.85 to $4.50 an acre. There was no particular certificate or document constituting the "scrip." As evidence of the right to select and acquire the government land in the particular case now in controversy, F. A. Hyde & Co. delivered to Hill, or to McDougall, an abstract of title to the base lands down to and including the deed of relinquishment to the United States, and also an irrevocable power of attorney, executed by F. A. Hyde & Co., constituting McDougall the attorney in fact of that corporation to select public land in any state or territory in lieu of the base lands surrendered (which were therein described), and empowering McDougall to sell and convey by good and sufficient deed—

"all of the right, title, and interest that said corporation now owns, holds, or possesses, and also all of the right, title, and interest that said corporation may hereafter acquire of, in, and to the land that has been or may hereafter be selected as aforesaid, or any part thereof, or to make and execute any contracts, bonds, or agreements relative to such lands for such sum or price, or on such terms, as he may deem proper."

Another clause of the instrument specifically authorizes McDougall to execute and deliver deeds and conveyances. So far as appears, this method of transferring the right of selection was that in common use at the time. Hill employed an attorney residing at Vancouver, who was reputed to be specially qualified in such matters, to examine all papers submitted by Hyde & Co. before payment was made to that company for the rights assigned. The record evidence further shows that McDougall, as attorney in fact of F. A. Hyde & Co., on July 25, 1900, made application through the United States land office at Vancouver, Wash. (the proper land office), to select the quarter section now in controversy in lieu of the base lands in section 36, for which F. A. Hyde & Co. then held the patent of the state of California. The required affidavits appear to have been filed and the required notice given. The abstract of title deposited with the Vancouver land office was made by an abstract company in Santa Barbara, and showed the essential proceedings leading up to and including the patent from the state of California to F. A. Hyde & Co. and the quitclaim deeds from the latter company to the United States, so that on their face these papers showed that F. A. Hyde & Co. had acquired perfect title to the quarter section in section 36, and had made a conveyance thereof

to the United States as provided in the statute and the regulations. On June 4, 1901, F. A. Hyde & Co. by McDougall as its attorney in fact, executed a deed to Truxbury and Sawyer, reciting the exchange of lands and conveying "all of the right, title, and interest that said corporation now owns, holds, possesses, and claims, and also all of the right, title, and interest that said corporation may hereafter acquire of, in, and to" the land now in controversy, and this deed was recorded in the proper records of Lewis county, Wash., on June 21, 1901. On June 21, 1902, the Commissioner of the General Land Office of the United States entered his formal approval of the selection by F. A. Hyde & Co. of the land now in controversy in lieu of the quarter section in section 36, and on July 22, 1902, the United States patent issued in regular form conveying these lieu lands to F. A. Hyde & Co. Something over three years after the issuance of this patent the bill was filed.

I do not find any evidence of a conspiracy or combination between Hyde and Benson, or between them and others, to defraud the United States by any of the means alleged in the bill, except in so far as it was a fraud on the United States to obtain government land by using as a basis of exchange land acquired by defrauding the state of California. The government has offered no evidence to sustain the allegations of the bill charging a corrupt and unlawful combination on the part of officials and employés of the United States. No evidence was offered which can be considered as substantiating the charge that Hyde and Benson influenced officers or employés of the land office or forestry service in respect to the fixing of the boundaries of the forest reservations or in respect to any of the proceedings on the part of the government which resulted in the patenting of the lieu lands. The evidence establishes that, in order to obtain patents from the state of California, Hyde procured Schlipf and others to sign false affidavits and to make applications to purchase state lands in the interest of Hyde; the applicants having no interest whatever in the proceedings. The method adopted constituted a fraud upon the state of California, which rendered the state patent issued to F. A. Hyde & Co. for section 36 voidable at the suit of the state. The United States have not relinquished or offered to relinquish section 36, or any part of it, either to F. A. Hyde & Co., from whom was received the conveyance thereof, or to the successors in interest of that company, Truxbury and Sawyer, or to the state of California. The value of section 36, or any part of it, has not been shown, and, if there is any material difference in value between the base lands and the lieu lands, such difference has not been made to appear.

The contention of the United States apparently is that the government can retain the base lands, of which it still holds the legal title and is a bona fide purchaser for value, and at the same time cancel the patent to the lieu lands, or at least that F. A. Hyde & Co., or its successors in interest, Truxbury and Sawyer, have no concern with the disposition to be made by the United States of the base lands. In support of this position, Hyde v. Shine, 199 U. S. 62, 25 Sup. Ct. 760, 50 L. Ed. 90, and United States v. Hyde (D. C.) 132 Fed. 545, are

cited. The question considered in those cases was the right of the United States to remove Hyde from the Northern district of California to the District of Columbia, for trial upon an indictment in which Hyde, Benson, and others were charged with a conspiracy to defraud the United States out of the title to large tracts of public lands. It appears that the facts alleged in the indictment were similar to those set forth in the bill in this suit; but the facts established by the evidence here fall far short of those allegations. I think it is open to question whether, on the facts now appearing, the government could obtain a decree canceling this patent, without rescinding, or offering to rescind, the exchange of lands. A private individual, who has been a party to such a transaction, and who, though occupying the position of bona fide purchaser as to the lands received by him, should desire to cancel his conveyance because of fraud perpetrated by his grantor in obtaining title from a former owner, would be obliged on well-known principles to rescind, or offer to rescind, the transaction, or at least the decree in such a case would compel him to do equity and restore what he has received. He could not retain what he has received and obtain a decree canceling his conveyance. True, he could not be compelled to stand on his position as a bona fide purchaser and waive his right to rescind; but, if he should elect to rescind, he must restore, or offer to restore, what he has received before he is given relief.

It is not clear that the principles announced in United States v. Minor, 114 U. S. 233, 5 Sup. Ct. 836, 29 L. Ed. 110, United States v. San Jacinto Tin Co., 125 U. S. 273, 8 Sup. Ct. 850, 31 L. Ed. 747, United States v. Trinidad Coal Co., 137 U. S. 160, 11 Sup. Ct. 57, 34 L. Ed. 640, and United States v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384, establish a different rule for suits in which the United States are complainants and the circumstances are those presented here. In all the cases falling under my observation, where the Supreme Court has held that the government may obtain the setting aside of land patents without restoring the consideration received, it appears that the fraud practiced by the patentees consisted in a successful attempt to evade the express provisions of the statute by which Congress had provided for the disposition of such lands, so that, as a result of the fraud, the title to the lands had so vested as to defeat the public policy declared by the statute. Here the result is precisely what Congress intended, namely, the securing of title by the government to the forest reserve lands and the patenting of an equal amount of vacant public land. Congress has expressed no concern in the statute which governs this exchange as to what persons or corporations may secure the vacant land, or as to the extent of area that any one owner may acquire. Here the fraud consisted in the means by which a result, otherwise lawful as far as the United States are concerned, was brought about. Though the fraud was sufficient to warrant the setting aside of the patent to the lieu lands in the absence of a bona fide purchaser, I am not clear as to the conditions under which that relief would be granted.

I find, however, that defendants Truxbury and Sawyer have fully established the defense of bona fide purchase for a valuable considera-

tion without notice. The evidence shows that they purchased for a fair price, in good faith, and had no notice whatever of the fraud. It is substantially conceded that such is the evidence in point of fact; but it is contended that they do not in law occupy the position of bona fide purchasers. The argument for complainants is that, as the deed from F. A. Hyde & Co. to these purchasers was made before the exchange of lands was approved by the Commissioner of the General Land Office, it was made before the equitable title passed from the United States, and, since F. A. Hyde & Co. then had nothing to convey, Truxbury and Sawyer have never received either the equitable or legal title. The answer to this is that there was no statute of the United States or rule of public policy that would prevent a landowner, after relinquishing forest reserve lands to the government, from executing and delivering an instrument which would operate to pass to another such title as he should thereafter acquire in the lieu lands selected. In many of the statutes regulating the disposition of the public lands, the making of such an instrument is prohibited; but nothing of the kind is found here. During the time that the statute governing this transaction was in force, it is very likely that numerous conveyances were made under like circumstances, and no reason appears for declaring them void. The statutes of Washington expressly declare that a quitclaim deed may pass an after-acquired title, where words are added expressing such intention. Ballinger's Ann. Codes & St. § 4521 (Pierce's Code, § 4453); Ankeny v. Clark, 1 Wash. St. 549, 20 Pac. 583. It follows that the deed to Truxbury and Sawyer operated to pass to them the full legal title as soon as that title passed from the United States to F. A. Hyde & Co.; and, as they were at that time still acting bona fide and without notice of anything in the nature of fraud, they acquired the equitable title as well. Furthermore, when they purchased the rights of F. A. Hyde & Co. they relied upon the patent from the state of California to that company, and paid the consideration in good faith and without notice of any fraud committed against the state, and they consequently acquired equitable and legal rights which the state could not ignore. Even if that state were now suing, it would not be in accordance with equity to set aside its patent, in view of what these purchasers have done in reliance on its validity.

It appearing, therefore, that defendants Truxbury and Sawyer are bona fide purchasers for a valuable consideration without notice, that they are the holders of the legal title, and that their equity is superior to that of complainants, the bill will be dismissed. The equity of this result is further apparent when it is considered that the United States still hold by an apparently unassailable title the forest reserve lands in exchange for which the Commissioner of the General Land Office approved the selection of the land in controversy, and the state of California, the party primarily interested in protecting its own public policy, has made no effort to set aside its patent.

A decree will be entered as above indicated.