UNITED STATES v. ALBRIGHT et al.

(District Court, D. Montana. July 1, 1916.)

1. STATUTES ⬅225¾—CONSTRUCTION—ADOPTION.
   The Legislature, in adopting a statute, is presumed to have acted with knowledge of previous construction of similar statutes, and to have intended such construction, unless it otherwise indicated.
   [Ed. Note.—For other cases, see Statutes, Cent. Dig. § 306; Dec. Dig. ⬅225¾.]

2. LIMITATION OF ACTIONS ⬅100(3)—RUNNING OF STATUTE—FRAUD.
   The six-year limitation prescribed by Act March 3, 1891, c. 561, § 8, 26 Stat. 1099, in which suit to cancel patents must be commenced, does not, as to a patent secured through fraud, in that the patentee was acting for speculative purposes and under an agreement to convey when he should receive his patent, begin to run until those facts are discovered, for a limitation statute, in so far as it applies to actions based on fraud, does not, where the fraud is concealed, begin to run until discovery.
   [Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 482, 483; Dec. Dig. ⬅100(3).]

3. PUBLIC LANDS ⬅131—PATENTS—ISSUANCE.
   Under Rev. St. §§ 2290, 2291 (Comp. St. 1913, §§ 4531, 4532), requiring an applicant for a patent to public lands to make oath his purpose is not speculation, but to secure a home, and that he has not made and will not make any agreement by which the title shall inure to any other's benefit, and on final proof to make oath that he has not alienated the land, the fact that an entryman who filed for speculative purposes recognized the possibility of a future alienation, and that he asked one who purchased a considerable time after the issuance of a patent if he would buy the land when the patent was secured, does not show that the purchaser knew the entry was speculative, or deprive the purchaser, who was bona fide, of the benefit of his good faith.
   [Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 347; Dec. Dig. ⬅131.]

4. PUBLIC LANDS ⬅135(2)—PATENTS—SPECULATIVE PURPOSES.
   Where an entryman on public lands, who secured a patent, was not actuated by speculative purpose at the time of his entry, he may, despite Rev. St. §§ 2290, 2291 (Comp. St. 1913, §§ 4531, 4532), declaring that a pat-

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ent shall not be issued to one entering for speculative purpose, dispose of the land after acquiring his patent.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 353, 354; Dec. Dig. ☞135(2).]

5. PUBLIC LANDS ☞120—PATENT.

Unless proof that a patent to public land was secured through fraud is clear and convincing, the patent should not be overthrown.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. ☞120.]

6. PUBLIC LANDS ☞120—EVIDENCE—SUFFICIENCY.

In a suit to cancel a patent to public lands, evidence *held* insufficient to show that defendant, to whom it was subsequently conveyed, had a contract for the purchase of the land when it was patented.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. ☞120.]

7. PUBLIC LANDS ☞120—EVIDENCE—SUFFICIENCY.

In a suit to cancel a patent to public lands, on the ground that the patentee was acting under a contract to subsequently convey to defendant, evidence *held* insufficient to establish any such agreement, or that the patentee's entry was not in good faith.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 332–335; Dec. Dig. ☞120.]

In Equity. Suits by the United States against William H. Albright and others. Decree for defendants.

B. K. Wheeler, U. S. Atty., and Frank Woody, Asst. U. S. Atty., both of Butte, Mont., and H. G. Murphy, Asst. U. S. Atty., of Helena, Mont.

Cooper, Stephenson & Hoover, of Great Falls, Mont., for defendants W. H. and V. C. Albright.

BOURQUIN, District Judge. April 22, 1901, a homestead patent issued to Whitaker, and August 18, 1902, one issued to Carter. These suits to cancel the patents, against the patentees and their transferees, were commenced September 11, 1915, and have been tried as one.

The complaints, in brief, are that the patentees made application for the lands, inspired by speculative purposes, and not for homes, under agreements to convey the lands, after final proof, to defendant Albright; that they did not comply with law in the matter of residence, improvement, and cultivation of the lands; that their final proofs, showing the contrary to all the foregoing, were false and to the knowledge of Albright; that the lands were so conveyed that title is now vested in Albright's wife for his benefit; that all the facts aforesaid were concealed from and not discovered by plaintiff until 1911. Carter was not served, Whitaker defaulted, and the Albrights denied, and pleaded bona fide purchase and limitations.

[1, 2] The statute (26 Stat. 1099) provides suits to vacate patents "shall only be brought within six years after the date of issuance of such patents." Long before it, the construction of like statutes, in courts of equity, was that they commenced to run only from discovery of fraud that is concealed or self-concealing. And this rule has been applied to this statute. See Linn, etc., Co. v. U. S., 203 Fed. 394, 121

C. C. A. 498, and cases cited; s. c., 236 U. S. 574, 35 Sup. Ct. 440, 59 L. Ed. 725, affirmed on other grounds.

Congress knew this construction, and intended it, when enacting said statute, or it would have indicated otherwise by appropriate language. This, too, is a settled rule of interpretation. The fraud alleged in the matter of residence, improvements, and cultivation was open to observation prior to and at final proof, and as cause of action is barred by the statute. That alleged to consist in speculative purpose and agreement to convey is concealed and self-concealing fraud, hidden until some participant discloses it, which was only done herein in 1911, and so is not barred.

[3-6] That the patentees conveyed to Albright, and the deeds were recorded, some six and nine months subsequent to patent, neither disclosed the fraud nor put on notice; for on their face they appeared honest transactions. From Whitaker's testimony, as a witness for plaintiff, it appears he needed money to apply on his home in Michigan. To procure it he made original entry of the land involved, intending to sell it to the best advantage. Having so entered it, he asked Albright if the latter would buy it after final proof; Albright with some demur saying he would, if able. After final proof a tentative agreement was made, and one year later, and six months subsequent to patent, Albright did buy the land, paying $750 therefor, and received and recorded a deed.

In this is perceived nothing warranting cancellation of the patent. The Homestead Law (R. S. §§ 2290, 2291 [Comp. St. §§ 4531, 4532]) requires the applicant to make oath his purpose is not speculation, but to secure a home, and that he has not made and will not make any agreement by which the title to the land "should inure" to any other's benefit, and at final proof requires him to make oath that he has not alienated any of the land. Whitaker's purpose was speculative, but nothing appears that would warrant a finding that it was known to Albright. True, after original entry Whitaker inquired if Albright would buy the land when final proof was made; but this was not notice that Whitaker was inspired by speculation rather than desire for a home, when he made his original entry or at all. It was but oral utterance of the thought necessarily in every entryman's mind—the possibility of a sometime sale—and in no wise inconsistent with his good faith. Furthermore, if it was, to deprive Albright of his status as a bona fide purchaser it would be necessary to find (and the court does not) he kept and had the fact in mind when he purchased some 29 months later. See U. S. v. Clark, 200 U. S. 608, 26 Sup. Ct. 340, 50 L. Ed. 613.

After original entry made, Whitaker could lawfully entertain a purpose to sell the land, rather than to retain it as a home; for the law stipulates his freedom from speculative purpose, and possession of intent to secure a home, shall exist at original entry only, recognizing circumstances may effect change therein in any honest entryman. The Land Department so construes the law, and see the analogous case of Williamson, 207 U. S. 461, 28 Sup. Ct. 163, 52 L. Ed. 278. And from the inquiry Whitaker made of Albright, the latter, if required to infer anything, could infer Whitaker's contemplation of possible sale arose

subsequent to original entry. After testifying as aforesaid, in response to leading and double questions, and questions assuming his testimony was otherwise than the fact, put by plaintiff's counsel, Whitaker testified he made the inquiry of Albright before original entry. Although no objections were made, under the circumstances, the witness only in theory adverse and not in fact, such testimony and so extracted deserves little consideration and weight. Furthermore, the conflict is not explained, and nothing persuades that the witness' last statement is more to be relied on than his first. At best, there is conflict, which must be resolved against the party tendering the witness. If the witness does not know, the court cannot know. It is obvious there is no evidence of the agreement to convey, alleged to have been made before final proof. Albright testifies to purchase in good faith. Circumstances from which suspicion might arise, in itself amounting to nothing, all taken together and with all else, are consistent with bona fide purchase by Albright.

A grant of lands by the United States, over its seal, upon every consideration must stand, unless overthrown by clear and convincing evidence of the fraud charged, in quality and quantity that inspires confidence and produces conviction. U. S. v. Budd, 144 U. S. 161, 12 Sup. Ct. 575, 36 L. Ed. 384. None such appears here. The doubtful, ambiguous, and conflicting recollection, 15 years subsequent to events, of those acknowledging themselves particeps criminis if the law was violated, does not satisfy the measure of evidence exacted; and less would make of patents mere scraps of paper, disturb titles, impair confidence, and destroy values.

[7] From Carter's testimony, as a witness for plaintiff, the situation appears much the same as in Whitaker's case, save that a like speculative intent seems absent. When he had testified that "along about the time of filing, or after," he had told Albright, "if I got title, why I would sell it to him," that he sold to Albright after final proof, on an agreement made after patent, that he (Carter) paid all costs, mortgaging the land to a bank to secure money to pay the purchase price of the land, he was asked by counsel for plaintiff that, if he had testified in a former case, as recited in narrative by counsel in considerable detail, amongst other things, that prior to filing he had talked with Albright in substance that, if Carter did not want the land, Albright "was to take it off my hands," that he "had this agreement to transfer the property to Mr. Albright prior to the time I filed, we talked it over in that way," "Would that be correct, was your recollection better then?" and he answered, "Well, I don't know; I expect it would be." He was then asked, "Do you recall having testified that way?" and answered, "Why, yes, something like that"; and the like were put, terminating in a leading and double question, in substance if there was not an understanding and agreement that, if Carter "didn't want to keep this land," he would sell it to Albright, and for a price of $640 agreed on before original entry, to which Carter answered, "Yes; I guess that is right." After testifying to an innocent situation, the witness is challengingly asked if he did not testify to an assumed evil one when his memory was better; and the impression created was that the witness, embarrassed by suggested earlier conflicting testi-

mony of his, weakly snatched at the way out pointed out by counsel in suggested better recollection (and perhaps to fall in with what he would infer was counsel's desire), and assented to the latter, if not to the truth of the former.

On cross-examination, Carter testified he would think his recollection was best when he made final proof, and the proof more nearly true—nearer the fact than any subsequent testimony, that he had no particular understanding with Albright, and that he took the land for his own benefit. Whitaker testified he had heard "talk since, more than before," "general opinion I would hear," that Carter "had taken up some land" for Albright.

Peterson's testimony that she knew Carter "had a homestead for Mr. Albright" is not supported by any facts known to and stated by her. She also testified she made a homestead entry at Albright's suggestion; she to "get the same as the rest," $640. Gustafson testified, "Carter told me he had a homestead for Albright"; that he (Gustafson) had an agreement with Albright, when Gustafson took up a homestead, "Give me the same show as the rest of the boys, * * * same price." If these scant conclusions of Peterson and Gustafson would suffice to prove that at some indefinite time they and Albright entered into prohibited agreements like those herein alleged, they are not evidence these alleged agreements were made. For the proof herein fails in respect to substance—the time and the terms of these alleged agreements at bar—and not merely in respect to intent and scienter; and other like offenses go only to determine the true character of the latter, when otherwise equivocal, and not at all to establish time and terms of otherwise, in these particulars, innocent, or even ambiguous, agreements.

Albright denied any agreement with Carter, and testified he paid Carter all the land was worth. It appears Albright operated a quarry where he employed some 80 men, and Carter worked for him as master mechanic, having a room in a bunk house and boarding at Albright's house; that some 18 of his men made homestead entries, a few of which he bought; that he also bought railroad land and entered lands with scrip. There is evidence from which it can be fairly inferred that Carter (and also Whitaker) availed himself of an opportunity to secure land at the same time he was in employment, and without interruption of his employment; his employer, Albright, favoring him therein. Such favor is to be commended, not condemned. But, as said of Whitaker's case, the indefinite, ambiguous, equivocal, conflicting testimony of assumed particeps criminis, taken in connection with all the circumstances and the indefinable impressions created during the trial (a trial of loose methods by both parties), does not serve to overcome the presumptions attaching to the patent, to measure up to the quantum of evidence necessary, and to satisfy the court the fraud alleged is proven.

Carter's testimony, even in view of the doubtful method of his examination and the more doubtful applicability of his responses to multiple questions, establishes no more than in Whitaker's case—a suggestion after original entry that, if Carter secured the land, Albright would buy it, if Carter did not want it—far short of the prohibited

agreement alleged. So would it be if made before original entry. The law forbids agreements by which the land "should inure" to any other's benefit; not those by which it only may so inure if the entryman after proof concludes to sell it. If a mere mask for the prohibited agreement, it would not avail to escape the consequences of the latter. But the fact that Carter mortgaged the land to secure purchase money, and did not sell to Albright until two years after proof and nine months after patent, in connection with all else, forbids belief that the alleged agreement was made.

The finding is the fraud alleged is not proven, save that Whitaker made entry with speculative purpose; that Albright purchased and paid value without notice. And since nothing is urged but cancellation of the patents, decree will go for defendants.