SEVERSON et al, Respondents, v. HOME INSURANCE COMPANY, Appellant.

(213 N. W. 726.)

(File No. 5606.    Opinion filed May 5, 1927.)

1. **Reformation of Instruments—Insurance—Evidence in Suit to Reform Fire Policy Held Not to Show Agent's Intent to Write Policy on Merchandise in Warehouse.**

   In action to reform fire insurance policy, evidence held not to show that agent intended to write policy in defendant company on stock of merchandise in warehouse.

2. **Reformation of Instruments—Burden Was on Plaintiff Suing to Reform Fire Policy to Prove Agent's Intent to Write Policy on Merchandise in Warehouse.**

   In suit to reform fire insurance policy, burden was on plaintiff to prove that agent intended to write policy in defendant company on stock of merchandise in warehouse.

3. **Insurance—Fraud—Policy, Not Truly Expressing Parties' Intent Through Fraud or Mutual Mistake, Will Be Reformed (Rev. Code 1919, § 2020).**

   Written contract, such as insurance policy, which does not truly express parties' intention through fraud or mutual mistake, will be reformed, in accord with Rev. Code 1919, § 2020.

4. **Reformation of Instruments—Burden of Proof—Clear and Convincing Evidence Is Necessary to Reform Policy.**

   Burden is on party seeking reformation of policy to prove his case by clear, unequivocal, and convincing evidence.

Note.—See, Headnote **(1)**, American Key-Numbered Digest, Reformation of instruments, Key-No. 45(14), 34 Cyc. 987; **(2)** Reformation of instruments, Key-No. 43, 34 Cyc. 980; **(3)** Insurance, Key-No. 143(3), 32 C. J. Sec. 247; **(4)** Reformation of instruments, Key-No. 45(14), 34 Cyc. 984.

As to right to reform insurance policy on ground of mistake of soliciting agent, see Annotation in 11 L. R. A. (N. S.) 357; 14 R. C. L. 903; 3 R. C. L. Supp. 312; 5 R. C. L. Supp. 785; 6 R. C. L. Supp. 838.

As to reformation of insurance policy, see Pomeroy's Equity Jurisprudence, Vol. 2, Sec. 871.

For forms in reformation of instruments, see Bancroft's Code Pleading, Vol. 4, pg. 3997.

Appeal from Circuit Court, Minnehaha County; Hon. L. L. Fleeger, Judge.

Action by Elmer O. Severson and another, copartners transacting business under the firm name and style of the Colton Hardware Company, and another, against the Home Insurance Company. From a judgment for plaintiffs, and an order denying a motion for a new trial, defendant appeals. Reversed, with directions.

*Boyce, Warren & Fairbank,* of Sioux Falls, for Appellant.
*Cherry & Davenport,* of Sioux Falls, for Respondents.

MISER, C. The Colton Hardware Company, a partnership, through its auditor, entered into an agreement with one R. to write insurance in the sum of $8,500 upon the stock of goods in the two-story, gravel-roofed, brick and hollow tile building known as the store building, situated on lot 16, and also to write insurance in the sum of $5,000 on the stock of goods in the one-story, tar paper roof, frame building known as the warehouse, suitated on lot 17. R. was president of the bank with which the hardware company did business, and was also the agent for eight fire insurance companies. In addition to writing fire insurance, he wrote automobile insurance and life insurance. R. did not carry out his agreement. He wrote one policy in the Commercial Union Assurance Company for $5,000, on the stock of goods in the store building, one policy in the Home Insurance Company, defendant herein, for $5,000 upon the same stock of goods in the same store building, and one policy in the Royal Insurance Company for $3,500 on the furniture, fixtures, etc., in the same building; namely,

the gravel-roofed, brick and hollow tile store building on lot 16. He wrote none on the stock in the one-story, tar paper roof, frame building known as the warehouse, on lot 17. In other words, instead of writing $8,500 insurance on the goods in the store building, he wrote $10,000; and, without any request therefor, he wrote $3,500 on the furniture and fixtures in the store building; and, instead of writing $5,000 on the stock of goods in the warehouse, he wrote none at all. This was on January 13, 1921. On October 28, 1921, the warehouse on lot 17, covered by no insurance, burned down and destroyed the stock of merchandise therein. The stock and furniture and fixtures in the store building on lot 16 were not injured. Plaintiff brought this action to reform the policy of the Home Insurance Company, to make it read to cover $5,000 insurance upon the merchandise in the warehouse which was destroyed, and, in the same action, seeks to recover upon it. From a judgment in plaintiff's favor reforming the policy as prayed for, and for the sum of $5,980.28, including $500 statutory penalty, under section 9195, Rev. Code, and from the order denying a motion for a new trial, defendant appeals.

[1] Appellant concedes that, if R., *as agent of the Home Insurance Company,* had agreed to write a policy of insurance for plaintiff upon the stock of merchandise in the warehouse, then the insurance company would be bound by such agreement, even though the policy were not, in fact, so written. Appellant contends, however, that there is no evidence that R., *as the agent of appellant,* did so.

The evidence discloses that, on January 13, 1921, the auditor, who for several years had been employed to make an annual audit of Plaintiff's books, discovered that there was insufficient insurance carried upon the stock of goods. He went to R.'s bank, accompanied by Severson, one of the partners, about 4 o'clock in the afternoon. Here he stated to R. that $13,500 of insurance was wanted, that $8,500 of it was to cover the stock in the store building, and $5,000 of it was to cover the stock in the warehouse. He handed to R. a memorandum containing the figures to that effect and the description of the lots upon which the buildings were situated, and also some lapsed policies. R. was familiar with the buildings, the risk, and the merchandise; and, as the agent of these eight insurance companies, his powers and duties were to solicit

for and consider applications, and to either accept or reject fire insurance risks, he having blank forms of insurance policies ready for his countersignature, which provided that the policy should take effect when countersigned and issued by such local agent. It was within his power and part of his duties to his various principals to insert the amount of the premium charged for the policy, and to collect the same, and to remit less his commissions. Accordingly he stated that the stock would be covered from noon of that day, and that he would write up the policies as soon as he could reach it. During this conversation, no particular insurance company was mentioned by name; and R. testifies that, at that time, he did not know what insurance companies he was going to write the insurance in.

Before 6 o'clock in the afternoon of the same day, he wrote the three policies hereinbefore described. He testifies that it was when he wrote the policies that he determined what companies he would write them in. No one else was present, and to no one did he communicate his intention. He made no memorandum that the warehouse stock would be insured in appellant company and, after writing the policies, threw away the memorandum and lapsed policies left with him. The rate upon the brick building was a premium of $93 on a policy of $5,000. On the wooden building, it would have been "again as much anyhow, approximately twice that." On the same day that he wrote the policy, he sent in a regular daily report to each of the companies, reporting the respective policies exactly as written, pasting a duplicate of the coverage forms in the three separate policy registers kept by him, and entered the respective amount of the premium in each policy register, the Commercial Union being credited with $93, the Royal with $65.10, and the defendant, Home Insurance Company, with $93. He made a memorandum therein to charge plaintiff's account on March 11, 1921, and placed the three policies in the vault of the bank, where they remained until after the fire. Just when he made a memorandum charge against plaintiff's account for the aggregate amount of the policies, $251.10, does not appear, but a check in that sum drawn on plaintiff's account, signed in the name of the plaintiff company by himself, was dated March 21st. This is Exhibit J, hereinafter referred to. On the following day a check, Exhibit K, signed by both partners, was delivered to him

and substituted for Exhibit J. The sum of $251.10, whether by
J or K, was charged to the hardware company account, and cred-
ited to R.'s personal account, and later remitted to his respective
principals, less his commission. With reference to whether the
money was transferred from the hardware company's account to
R.'s personal account by means of Exhibit J or K, his testimony
is as follows. Testifying as to Exhibit J, he says:

"I wrote that check and signed it; and I transferred the funds
in the account of the Colton Hardware Company by the use of this
exhibit and preserved it as a memoranda."

Thereafter, the following examination took place:

"Q. Now I show you Exhibit K. Whose signature is on
that? A. G. Ellis and E. A. Severson.

"Q. That is the two members of the partnership of the firm
of Colton Hardware Company? A. Yes, sir.

"Q. Did you procure their signature? A. Yes; I did.

"Q. Did you state to them at the time that you had issued
those three policies in question? A. I did.

"Q. And asked them to pay the premium by issuing a check?
A. Yes.

"Q. And did they do so? A. They did.

"Q. And did you cash that check? A. I did.

"Q. And drew the $251.10 out of their account and placed
it in your own? A. I did.

"Q. And, when you collected this premium on all three poli-
cies, $251.10 as shown by the exhibit, check, state whether or not,
at that time, when you got the check, it was explained what the
same was for and what the premiums were. A. Yes; I told them
just exactly what the figures were and what it was for."

It is a matter of no importance whether the hardware com-
pany's account was charged by means of Exhibit J or K. It is
important only that the witness R. testified both ways. The con-
versation, if any, which took place between R. and the members of
the partnership is more important. It will be observed that no
effort was made to give the conversation in hæc verba. An infer-
ence that the policy of the appellant company was stated by R.
to cover the warehouse at the time of the collection of the pre-
mium is negatived by R.'s further testimony as follows:

"Q. There was no discussion as to what companies they were in? A. Absolutely none. I just told them the total bill for the three policies amounted to $251.10."

Which one of the partners R. talked to at the time he procured their signatures to Exhibit K is not disclosed by the evidence. He does not state; the partner Ellis does not testify; and the partner Severson testifies:

"I was informed through our bookkeeper, the girl that worked for us, in regard to the premium; and I drew the check for the premium and sent it over to the bank."

It therefore appears that R. at no time mentioned to any one, prior to the fire, that it was the policy in appellant company that was written on the stock in the warehouse. The fire occurred on the evening of October 28th. While the fire was in progress, R. stated to Severson:

"You are protected, and I have the policy over at the bank and will inform the companies in the morning of your loss."

The following morning, he was surprised to discover that he had written no insurance policy upon the goods in the warehouse. On November 1st, three days after the fire, R., Severson, and the auditor went to the office of counsel for plaintiff and were there present when a letter was written to the three companies hereinbefore named, a portion of which letter, referring to R., is as follows:

"He says that, through a mistake and by inadvertence on his part, he wholly overlooked placing $5,000 of this insurance as he had agreed to do and had been directed to do on the stock in the warehouse, but placed the whole of it, through mistake, upon the stock in the store building."

Further and in the same letter, it is stated that he did not send in notice of loss—
"as he had suggested to Mr. Severson he would do, for the reason that he was in doubt as to whether or not it should be sent to one or all of these respective companies, or what should be done about it."

The letter closes with the suggestion that the three abovementioned companies make full settlement of the hardware company's loss.

R. never, at any time, gave any further notification to the company of the loss; and the first notification received by appellant insurance company was by letter from counsel for plaintiffs dated on November 23, 1921, in which they are advised that the policy in the Home Insurance Company was by R. intended to be written on the warehouse stock. At the trial, R. testified, with reference to the order in which he wrote the three policies, that he wrote the Commercial Union first for $5,000 upon the stock in the store building. He then wrote the $3,500 policy in the Royal Insurance Company [on the furniture and fixtures in this same store building]. He was then asked whether he was following any memoranda in preparing those two policies. He answered:

"I followed the memorandum on the first policy, and then I laid the form—the daily report and the riders—I laid the rider that set forth the description on my typewriter desk and followed them, instead of following the memorandum after I had written the first policy. * * *

"Q. Having written up the $8,500 on that store stock of the store, then what did you do? A. I wrote the $5,000 in the Home Insurance Company—the remaining $5,000.

"Q. How did it happen that you gave the description of the building on lot 16 and the stock, do you know? A. I followed the same rider and, through inadvertence, copied the same description on all three policies.

"Q. And how did it happen, if you know, that you wrote up the policies in the Commercial Union and the Royal first? A. The Commercial Union was my favorite company and has the largest line of insurance of any of the companies for which I am agent, and I wrote their policy first for the amount of $5,000, which left $3,500 to be placed on the same building stock and I put that in the Royal. Then I placed the other $5,000 in the Home on this other stock in the warehouse.

"Q. What was there that made you think that you should have written that upon the wooden building, instead of having written the policy in the Commercial Union upon the wooden building? A. After the excitement was over and I went over the thing again by myself in the bank, I remembered very distinctly that I wrote the Commercial Union policy first. That left $3,500 more to write on the brick building, according to the explicit in-

structions I had received; and it was natural to assume that, after that, the Home Insurance Company would be the only policy to write on the other building.

"Q. That was the only thing that made you conclude that you should have written this $5,000 in the Home upon the wooden building, wasn't it? A. You mean my memory?

"Q. Yes. A.. Yes."

Certainly it is true that there was not introduced at the trial a scintilla of writing which would refresh the memory as to which policy was first written, or as to which, at the time that they were written, was intended to cover the stock of goods in the warehouse. If R. intended the policy in appellant company to cover the warehouse stock, then he made the following mistakes in writing it: First, he wrote it upon goods in a two-story, gravel-roof, brick and hollow tile building on lot 16, instead of upon goods in a one-story, tar paper roof frame building on lot 17, with both of which buildings he was familiar. Second, he wrote into it a rate of $1.86, or a premium of $93, whereas the rate and premium should have been twice as much; this to his own loss. Third, he entered in the policy register the wrong rate and the wrong premium and thereby repeated mistake number 2. Fourth, he drew the memorandum check dated March 21st, charging plaintiff's account $251.10; whereas he should have made it about $93 more, this to his own loss. Fifth, on March 22d, when he collected the check for $251.10, he "told them exactly what the figures were and what it was for," and collected about $93 less than he should have collected. Sixth, at the time the mistakes were being made in writing the policy in appellant's company, or a few minutes before, if at the trial he correctly remembered the order in which he wrote the three policies, he had made the mistake of writing the Royal policy on the furniture and fixtures instead of on the stock of goods. The morning after the fire, when he took these three policies out of the vault, although he was surprised that none of them covered the stock of goods in the warehouse, he did not remember which one was so intended. Four days after the fire, at the office of plaintiff's counsel, he went over the matter thoroughly and carefully with the auditor and the partner. who ordered the insurance, and still he did not remember. About a week after the fire, he went over the thing again by

himself in the bank and remembered very distinctly that he wrote the Commercial Union policy first, that he wrote the Royal policy second, and that he wrote the Home Insurance Company policy third, and on the stock of goods in the warehouse. He remembered that the memorandum which was left with him, and which was thrown away immediately after the policies were written, called for $8,500 of insurance to be written on the stock contained in the brick building situated on lot 16, and it called for $5,000 of insurance to be written on the stock in the warehouse on the adjoining lot No. 17. He remembered that he followed that memorandum in writing the first policy. We do not determine herein whether, upon this evidence, R. was acting as a mere broker; that is, the agent of plaintiffs in procuring this insurance, and therefore personally liable, under Lindsay v. Pettigrew, 5 S. D. 500, 59 N. W. 726. We do determine, however, that if, at the time these policies were written by R., one was intended to cover the stock in the warehouse, and that one was the Home Insurance Company policy, the evidence of such intent does not amount to more than a bare preponderance, and this without arrogating to this court the functions and responsibilities of the trial court as to the veracity of the witness.

[2]    It is true that R. was examined by plaintiff, respondent, as an adverse witness under the statute, as the agent of appellant, but we find nothing in the testimony which would indicate hostility to plaintiff or to the success of their action; and it is significant that if, as he now testifies, it was within a week after the fire that he remembered that he intended to write appellant company's policy on lot 17, as their agent, that the first notice which they received was not from him, their agent, but, some three weeks later, from counsel for respondent. Furthermore, this partnership did their banking with the bank of which he was president. The fact remains that the burden of proof rests upon the plaintiff, and that the proof submitted by plaintiff is founded on R.'s memory.

[3]    This is an action to reform a written instrument. In Mead v. Westchester Ins. Co., 64 N. Y. 453, affirming 3 Hun, 608, it was held that "to justify the court in changing the language" of a written instrument a mutual mistake must be established by proof "so clear and convincing as to leave no room for doubt."

This case involved the identity of the premises agreed to be

insured. In Kleis v. Niagara Fire Ins. Co., 117 Mich. 469, 76 N. W. 155, many cases are considered, with the following comment:

"The inference to be drawn from these cases is that, where there is fraud or mistake, equity may afford relief, but will do so cautiously, and will require clear proof of the fraud, or mistake."

In Farwell v. Home Insurance Co. (C. C. A.), 136 F. 97, which has long been a leading case on the reformation of instruments, it is stated:

"It is unquestionably the rule that, to entitle the complainants to relief, the evidence must be clear, unequivocal, and convincing." U. S. v. Budd, 144 U. S. 154, 12 S. Ct. 575, 36 L. ed. 384.

In U. S. v. Maxwell Land-Grant Co., 121 U. S. 325, 381, 7 S. Ct. 1015, 1028 (30 L. ed. 949), Justice Miller, in delivering the opinion of the court, said:

"In Story's Equity Jurisprudence, section 157, it is said that relief will be granted in cases of written instruments only where there is a plain mistake, clearly made out by satisfactory proofs. Chancellor Kent, in the case of Lyman v. United Ins. Co., 2 Johns. Ch. 632, which had reference to reforming a policy of insurance, says: 'The cases which treat of this head of equity jurisdiction require the mistake to be made out in the most clear and decided manner, and to the entire satisfaction of the court.' "

Justice Miller then says:

"We take the general doctrine to be, that when in court of equity it is proposed to set aside, to annul or to correct a written instrument for fraud or mistake in the execution of the instrument itself, the testimony on which this is done must be clear, unequivocal, and convincing, and that it cannot be done upon a bare preponderance of evidence which leaves the issue in doubt."

Cooley, in his Briefs on the Law of Insurance, says:

"It is a general rule that, in order to justify the reformation of a written contract, the evidence must be strong, clear and convincing." Volume 1, p. 896.

And, on the following page, he cites a formidable list of cases requiring, in substance, that the evidence be sufficient to convince the mind beyond a reasonable doubt. The same author, in volume 6, p. 854, says:

"It seems to be established law that the rules as to the reformation of written instruments apply to an insurance policy in the

same manner as to other contracts. Hence, on a clear showing that, through fraud or mistake, the policy does not express the intent of the parties, it will be reformed."

[4] This rule seems to be in accord with section 2020, Rev. Code 1919. In other words, when, through fraud or mutual mistake of the parties, a written contract does not truly express the intention of the parties, equity has uniformly granted a reformation, but the burden rests upon the person who applies for a reformation to prove his case by evidence of a class which commands respect, and in an amount which produces conviction. This the plaintiff has failed to do. Many authorities are cited by counsel upon the proposition that, where an application for insurance is made to an agent who represents several companies, and the company is selected by the agent and designated as the company in which the insurance is to be written, a binding contract results. In addition to the cases cited by counsel, the case of Milwaukee Bedding Co. v. Graebner, 182 Wis. 171, 196 N. W. 533, furnishes additional authorities, as well as many cited by counsel. Few of these cases go as far in the reformation of a written instrument as plaintiff asks the court to do in this case. In none of them, where reformation was allowed, did the evidence so fail to meet the demands of the rule hereinbefore mentioned; namely, that it be clear, unequivocal, and convincing.

The judgment and order appealed from are reversed with directions to enter judgment for appellant dismissing the complaint.

CAMPBELL, P. J., and GATES, POLLEY, SHERWOOD, and BURCH, JJ., concur.