FUNK v. DYESS COLONY, INC.

4-5845

139 S. W. 2d 12

Opinion delivered March 25, 1940.

*A. F. Barham* and *Horace Sloan*, for appellant.

*J. M. Futrell, Cecil Shane* and *Oscar Fendler*, for appellee.

GRIFFIN SMITH, C. J. March 28, 1938, separate demands were made upon S. B. Funk and A. J. McCraven to deliver possession of property they occupied in Dyess Colony, Inc. The demands came from the corporation's board of directors and contained the statement: "Your attitude, manifested in many ways, renders it necessary that your probation be terminated."

The notices were disregarded. At the expiration of three days suits were filed in unlawful detainer. Upon motion of the defendants (appellants here) the causes were transferred to chancery and by agreement consolidated for trial.

Because of similarity to the Funk Case, pleadings in the McCraven suit were not abstracted. Funk's answer denied that the plaintiff owned the land in ques-

tion; that he was a tenant at will; that legal notice to quit had been received, and that he unlawfully detained plaintiff in its right of occupancy.

By way of cross-complaint it was alleged that the defendant and his wife contracted with Arkansas Rural Rehabilitation Corporation to purchase the southwest quarter of the southwest quarter of section 35, township 12 north, range eight east, the price to be "actual cost with the improvements." A requirement was that Funk should clear most of the land. It is further alleged that the price to be paid should be ascertained as soon as all buildings had been completed, and "the total sum of the actual cost will be divided into 25 annual installments." The corporation was to execute its deed, secured by deed in trust upon the land. The contract was entered into on behalf of the corporation by W. R. Dyess, its president. The land was wild. Defendant and his wife were insolvent—a fact known to Dyess. He agreed that the corporation would sell defendant live stock and farming equipment for use in clearing and cultivating the land, and would advance money and supplies over a period of years while the land was being put in condition. It was contended that all buildings within the colony were completed by January 1, 1936. At that time Funk and his wife had cleared lands and made improvements worth $600.[1]

Shortly after the death of Dyess an Arkansas corporation was formed, and the Rural Rehabilitation Corporation conveyed to this new entity—Dyess Colony, Inc.—all lands embraced within the colonization enterprise.

Insisting that his rights had been infringed, Funk alleged that in April, 1938, the plaintiff "unlawfully and through abuse of process" procured a justice of the peace to issue a writ of replevin whereby his mules and other property were taken, "greatly interfering with [defendant's] effort to cultivate said lands," and that usable value of the property was $5 per day.

---

[1] As to the McCraven's contract, it was alleged that value of clearings and improvements was $261.53.

There was the additional allegation by Funk that during 1935, 1936, and 1937, he bought supplies and borrowed money from plaintiff, "and delivered to it eight bales of cotton and seed for which it has never accounted," and that the corporation in many instances had overcharged him for merchandise.

Specific performance of the contract was prayed.[2]

Plaintiff replied, denying all material allegations. Specifically, there was denial that the corporation had contracted with either of the defendants. There was an allegation that the defendants were placed in possession "with the understanding that if and when they demonstrated their capacity for small farm management, and [had shown] such habits of thrift, industry and economy as should warrant a reasonable belief that they would pay for said land, . . . and shall have shown those qualities of mind and character which fit people for fair citizenship so that they would be assets to the community in which they might live, said defendants would either be given a sales contract for said land, or a deed with mortgage back to secure deferred payments, or the equivalent of such deed and mortgage."[3] [Other allegations are quoted in the third footnote.]

In an amendment to the complaint judgment for damages was asked "for unlawful detainer of said land and for the additional sum of $1,465.99."[4]

In an amendment to the cross-complaint it was alleged that actual cost of the land was $2.50 per acre; that cost of improvements did not exceed $25 per acre; that actual cost of the land and improvements was not more than $30 per acre; that plaintiffs had been wrongfully charged with many items of expense—items in no

[2] Funk's wife and McCraven's wife came into the litigation through interventions.

[3] "Notwithstanding the fact that defendants failed to fully measure up to the requirements aforesaid as purchasers of said lands, lack in this respect was waived and plaintiff executed its deed to defendants and sent the same to the colony center for delivery to the defendants. Defendants were notified that the deed was there for delivery."

[4] A verified account was attached to the amended complaint, showing the balance of $1,465.99 to be due "for goods, wares, and merchandise sold and delivered to the defendant." The statement covers ten full single-spaced typewritten pages, legal size.

way connected with the land and improvements. There was a prayer for appointment of a master to take proof and state an account.

There was testimony by H. C. Baker, secretary-treasurer, who was also a director and one of the stockholders of Dyess Colony, that the colonization project was conceived by W. R. Dyess in May, 1934; that it was undertaken with money supplied by the Emergency Relief Administration consisting, originally, of funds allotted the state, and in turn reallotted to Emergency Relief Administration by the governor. The purpose was to rehabilitate relief clients who had a farming background and who might be interested in purchasing land. Approximately 16,000 acres were bought in Mississippi county. Colonists were admitted in the fall of 1934 under an agreement that they would be responsive to directions of and be supervised by the Emergency Relief Administration or its successors; that they would strive to conform to any plan ultimately made for the colony as a whole. If the applicants "showed themselves adaptable and evidenced an interest in ownership, the colony would ultimately offer a long-term purchase contract under which the price asked would not exceed the cost of the lands as improved."

When Rural Rehabilitation Corporation (as distinguished from Emergency Relief Administration) was organized, purchase of the lands was consummated; and, as explained, *supra,* Rural Rehabilitation Corporation was succeeded by appellee, Dyess Colony, Inc.

Witness was positive the rehabilitation corporation did not authorize the sale of any land. The work begun in 1934, which continued through 1937, included clearing land, building houses, roads, etc. Funk was placed in possession with the understanding that he would accommodate himself to the colonization plan. If he did this, opportunity to acquire a home would be offered. Dyess Colony, Inc., first authorized execution of deeds December 31, 1936.

A deed to the land contended for by Funk and his wife, Ruth, was executed July 14, 1937. The price was

$2,999.52, payable in annual installments of $153.03, the first payment falling due November 15, 1937, and the last installment maturing November 15, 1967. Interest was to be charged at 3 per cent. Its salient provisions are shown in the fifth footnote.[5]

, E. S. Dudley, resident manager for the colony, testified that he delivered the deed to Funk; that it was returned and left in his office, and "It is my recollection that [Funk] gave no reason for not accepting the deed." Delivery of the deed was about August 15, 1937.

Dudley further testified: "Up to the time I delivered [the Funk] deed, he had an agreement or contract on file, made with Arkansas Rural Rehabilitation Corporation. . . . At the time I offered him the deed I did not know he had that contract. . . . I reported to the board [of directors] that the deed had been returned and not accepted. Also, it was reported to me by the farm division that they were having difficulty in getting Mr. Funk to farm in the general plan and take advantage of time and opportunity as he should. . . . I did not discuss with him his reason for returning the deed to me."

Funk contended he had an agreement one year to grow tomatoes, to can them, and to sell them to the colony. Dudley disclaimed knowledge of such contract.

---

[5] Conditions in the deed complained of by Funk provided: (a) That Funk should personally and continuously occupy and use said property exclusively as a farm and home for himself and family; (b) that he would cultivate and harvest such crops and conduct such livestock, poultry, and dairy enterprises as are in accordance with approved farm organization, management and practices, and good husbandry . . .; (c) that he would at all times keep the property in repair, free from weeds. etc.; (d) that he would not, without the consent of the corporation, demolish, alter or change the location or character of the principal buildings or erect new ones on said property; (e) that he would not lease or let any part of the property, or mortgage or encumber (other than to the corporation) any crops or products; (f) that he would keep insurance on the buildings as directed by the corporation, and in event of loss use insurance proceeds to repair or restore the damaged property. (g) The corporation reserved the right of ingress and egress over the property at all times, with the right to install public utilities. (h) The purchaser, for himself, his heirs and assigns, agreed that in consideration of the mutual benefits, purposes and intentions that caused Dyess Colony to be founded, Funk and his family, his heirs and assigns would abide by all administrative directions and supervision of the corporation. (i) The purchaser could not sell without first giving the colony an option to buy at the same price, and the subsequent purchaser would also be subject to the colony's administrative powers. (j) If the purchaser violated any condition in the deed, he was subject to ejectment on 30 days' notice, even during the season of planting and cultivation of crops, the colony agreeing to make certain refunds in such cases. If the purchaser did not vacate within the 30 days he would be treated as a tenant at sufference. (k) The deed did not contain a general warranty of title.

The contract made with Funk by Arkansas Rural Rehabilitation Corporation March 29, 1935, relates to house No. 8. Serial number is 268. Funk is referred to as a "client" of the Rural Rehabilitation Division of the Emergency Relief Administration, called party of the first part. Arkansas Rural Rehabilitation Corporation, a Delaware corporation authorized to do business in Arkansas, "and being a division and subsidiary organization of the Emergency Relief Administration," is identified as the party of the second part.

In consideration of the moneys, properties, and assistance extended and to be extended by the Emergency Relief Administration, Funk agreed to purchase from the Arkansas Rural Rehabilitation Corporation "certain lands and improvements thereon" known as a part of Arkansas Colonization Project No. 1, "and to pay therefor over a period of years a sum of money to be determined at a later date hereinafter mentioned through appraisal of the said property, but in no event shall the amount to be paid by [Funk] exceed the actual cost of the land and improvements thereon plus interest at the rate of 5 per cent. per annum."

Funk agreed to at once move onto the lands and into the house designated, to clear land, make improvements, and to perform all things necessary to the planting and growing "of such crops as are deemed advisable by and in accordance with" the plan of the management. He agreed to comply with all orders, regulations, and directions prescribed.

The administration agreed to "sell to [Funk] or to lend funds to him as needed for the purchase of subsistence" in an amount not to exceed $630.

Two express conditions were: (1) That Funk should be a qualified client of the Rural Rehabilitation Division of the Emergency Relief Administration and "remain so during the life of this contract and abide the rules and regulations of that division." (2) That when a fair appraisal of the value of each homesite in the project should have been determined (not to exceed actual cost in any event, plus interest), a contract of

sale would be entered into "amortizing yearly payments within the reasonable earnings of said homesite. Provided, however, that both parties to this agreement will be bound by the judgment or decision of the Rural Rehabilitation Division of the Emergency Relief Administration rendered on or before the date of the completion of said Arkansas Colonization Project No. 1, as above stated (but not later than two years from the date of this contract) as to whether or not [Funk] will continue as an accredited rural client of said Emergency Relief Administration."

There was a provision that, in the event Funk should not continue as a client, the agreement would be void; that the property would be surrendered, ". . . and the [administration], in such event, agrees to reimburse or give credit to [Funk] on [his] indebtedness for a reasonable sum for the clearing of land and all other work and improvements performed on such tract."

There is this provision: "If all of the above covenants are complied with by [Funk], and the Rural Rehabilitation Division of the Emergency Relief Administration of Arkansas so recommends, then [the administration] hereby agrees upon the completion of said Arkansas Colonization Project No. 1 to enter into a sales agreement with [Funk] as hereinbefore mentioned, and to transfer title of the homesite purchased by [Funk] upon the performance [by him] of the conditions contained in the said sales agreement."

Finally, it was agreed that the value of advances of any nature should be evidenced by notes, with interest at the rate of five per cent. per annum.

Funk testified he was on relief in Saline county when informed by the administrator there that the colonization project was advantageous. Upon arriving at the colony he found the land to be a swamp, heavily timbered. He moved into a house already completed. Also, there was a barn and chicken house. Assisted by his boys, Funk cleared 35 acres. The uncleared part was reserved for wood and pasture:—"I cleared the

land for $14.50 an acre, but it was worth $25. The ditching I did was worth $100, and I built a rail fence worth $20."

Funk testified that he had been ready at all times to comply with his contract, and was still willing.

In explanation of the proffered deed, he said: "It was given me about July 14, 1937. I kept it, maybe, three weeks and then returned it to Mr. Dudley's secretary at his office. I did not give any reason there at that time why I didn't want to keep it. I had compared it with my contract, and didn't accept it because it didn't correspond with the contract. The original agreement was to sell the land and improvements at actual cost. I know what the cost of this land was—it was $2.50 per acre. Mr. Dyess told me that."

Appellant [Funk] testified that "from experiences and inquiries" he couldn't see how cost of the house could exceed $800; that reasonable cost of the barn was $150, and the chicken house was worth $15. He complained that 2,363 cans of tomatoes prepared in 1936 under contract with the colony had not been accepted, and that because the cans bore the embossed inscription "Free—to be given away, and not sold," he was unable to dispose of them. In the spring of 1938 his mules and plow tools were taken. Witness received a letter from Dudley asking that they be surrendered:—"An officer put me under arrest and took me to the center. He had a pistol, but no warrant. The farm supervisor was drunk. He abused and cursed me. He was the man who was supposed to direct and tell us how to run our business."

Further testifying Funk said: "When I went on that land it had no earning value. It couldn't possibly have had much in 1935 and 1936. It was understood during those years I was clearing it that it would not be productive and that any money loaned to me would have to be paid later, out of the earnings when the land became cleared and ready for cultivation."

There is the statement: "They are supposed to have loaned me in goods, merchandise, and cash, $2,-

227.31. I paid $715.39—all I could pay them. . . . I didn't pay for the mules when the amount was due the first of November, 1937, but I gave them eight bales of cotton."

A tabulation of the factors utilized by the administration in determining the price to be charged for farm-homesites in the colony was prepared by R. A. Lile, certified public accountant. In arriving at the cost of a building, account was taken of materials, labor, transportation and other factors entering directly into the transaction. As to lands, the cost units were improvement taxes, delinquent taxes paid in order that the property might be redeemed, attorney fees, engineering costs, abstracts, etc.

Cost of the land (exclusive of the community center) was $124,124.54. Cost of the Funk buildings was: House, $2,105.17; barn, $342.86; chicken house, $74.02.

In computing the cost of land, the item of $124,124.54 was divided by the number of acres, the average being $8.33. The Funk land, therefore, cost $324.79. Ditches (thought to be a direct benefit to the land) had to be constructed. This item was shown to be $6.09 per acre, or $237.43 for the acreage in question. The officials considered it would cost approximately $15 per acre to clear the land, and as to Funk that item was $584.85. Total cost of the land and improvements was $3,438.97.

Roads built by the WPA (the colony furnished materials) cost $426,904.17. These were necessary to enable colonists to engage in convenient commercial and agricultural intercourse. Roads were not charged against the land. Bridges cost $55,523.36, but for these the colonists were not asked to pay.

To transport materials to the colony before highways were constructed, a railway "spur" was built at a cost of $35,908.49.

School buildings were provided by the WPA and the colony at a cost of $19,704.98.

Harry Dunavant, postmaster at Keiser, and J. A. Pigg, an abstracter, testified that the land when cleared

was worth from $50 to $60 per acre, exclusive of buildings.

## OPINION

The record in the consolidated cases comprises nearly 600 pages. We have stated the principal facts and have quoted at length from the testimony. The issue is novel and without precedent in this state because of apposition of appellants and appellee.

On one side we have governmental agencies experimenting with a colonization project conceived in the minds of well-intentioned and philanthropically-inclined men whose purpose it was to chart an economic course for underprivileged citizens and for citizens who through misfortune had been thwarted in their pursuit of self-sufficiency. With money supplied by a sympathetic government acting somewhat in a paternalistic capacity, the idealists who attached a practical meaning to the concept that man is his brother's keeper designed a system they believed would supply the opportunity needed by certain victims of adversity.

On the other side were the prospective colonists. To qualify, it was requisite that they be on relief. Only those who had been unable to secure private employment and whose positions in the social scheme had become a matter of compelling public concern were permitted to apply for rehabilitation under the colonization plan.

Commenting on the development and the end sought to be achieved, counsel for appellee in their brief say: "The land had to be cleared and farm buildings erected on small tracts ranging from less than twenty to forty acres. Many large drainage ditches had to be dug with drag lines, and roads had to be built. All of this had to be done before cost of each small tract could be determined, or an appraisal made.

"This fitted in with the fixed policy of the management—to sell to those only who had demonstrated their capacity, fitness, and ability to pay for their homes if given an opportunity. Their habits of industry, thrift, and ability for small farm management had to be first demonstrated. The settlers were put on trial, and dur-

ing that time they were furnished regularly with work at fair prices and with all necessary supplies and with schools and medical needs, on account of which there are $400,000 of unpaid frozen accounts. . . . The schools have not cost the residents of the colony one red cent, and nothing on this account is charged, and this includes their transportation to and from school."

Appellants insist that Funk was justified in returning the deed tendered him "because it did not conform to the contract, and because it violated art. 2, § 28, of the constitution of Arkansas." [6] We may dismiss the constitutional objection with the statement that it has no application.

The question is, Did the contract of March 29, 1935, impose upon Dyess Colony, Inc., as successor to Arkansas Rural Rehabilitation Corporation, an obligation to sell to Funk the property involved in this suit?

The chancellor found that appellants entered into possession under an oral contract; that the oral agreement merged in the written contract; that Funk was paid for clearing the land he claimed; that during the time clearing was in progress appellee furnished him with supplies, etc., and that at time of suit Funk was indebted to the corporation in an amount approximating $1,700; that the deed tendered in July, 1937, was returned by Funk without explanation after it had been retained "for several weeks"; that facts in the McCraven Case are essentially the same as those in the Funk suit except the tract of land involved is smaller, there was no tender of a deed, and McCraven was not indebted to appellee at the time demand was made to vacate; that, conversely, McCraven was shown to have certain credits for clearing land, constructing ditches, and building fences, "acts performed under the contract for which it was agreed he should be paid in the event plaintiff declined to convey or contract to convey the land to him."

There was this further finding: "The contract, [when] carefully read, clearly shows that plaintiff is

___

[6] "All lands in this state are declared to be allodial; and feudal tenures of every description, with all their incidents, are prohibited."

not obligated to convey, unless it so elects, and there is no provision in the contract which confers on defendants the right to enforce specific performance. The only provision thereof which may be enforced by defendants is that part which provides that in the event plaintiff does not convey the land to defendant it shall pay defendant the cost of clearing and other improvements. Funk contends that the purchase price fixed in the deed . . . is in excess of the agreed price. The preponderance of the evidence shows that the price fixed in the deed is less than the cost of the land and improvements, plus interest at the contract rate.

"He further contends that at the request of plaintiff he planted two acres of land in tomatoes in the year 1935, purchased 2,363 cans from plaintiff, and canned [the tomatoes], but markings on the cans were such that the product could be handled only by plaintiff, and plaintiff refused to accept the same; that he endeavored to dispose of them, but was unable to do so on account of the labeling, and thereby lost the value of the same. While the evidence is not clear in this matter, plaintiff ought to pay for this crop, if in fact it agreed to take and pay for the same. . . . Decree for plaintiff for possession [of] each tract. Decree for McCraven for clearing and improvements."

We affirm the chancellor's decree, but attach to it the construction that it was the court's intention to allow Funk the fair value of 2,363 cans of tomatoes. If within fifteen days appellee does not file with this court a stipulation showing it has agreed with this appellant in respect of the amount to be paid, or credited on his account (the alternative to be optional with appellee), the cause as to Funk will be remanded with directions that such determination be made.

We do not construe the Funk contract as an unconditional promise to make a deed. There was an express condition that both parties to the agreement would "be bound by the judgment or decision of the Rural Rehabilitation Division of the Emergency Relief Administration . . . as to whether or not [Funk] will continue as an accredited rural client of the Emergency Re-

lief Administration." If the party on probation failed to continue as a client, the agreement was to be void. In that event payment was to be made for the work done.

Inasmuch as a deed was tendered Funk, it will be assumed that formality of recommendation, and the question of his status as a client, were waived; and had he accepted the deed, appellee could not prevail. But the deed was returned without explanation. Appellee had the right to attach conditions to the deed. The contract of 1935 was one "to enter into a sales agreement with [Funk] as hereinbefore mentioned."

Transfer of title was dependent upon performance "of the conditions contained in the sales agreement." Although the proffered document was something more than a sales agreement, Funk cannot complain of the fact that in certain respects it arose above the dignity of a contract and assumed the characteristics of a deed —a deed with conditions imposed. Appellee had a right to incorporate the conditions in a sales agreement; and, since a sales agreement was all Funk could demand, he will not be heard to object that the conditions were repugnant to a deed conveying title in fee simple.

There was no tender of a deed to McCraven; hence, appellee did not waive the reserved rights to accept or reject this client as a purchaser.

Affirmed on direct appeal and on cross-appeal.