**UNITED STATES of America,**
**Plaintiff,**

v.

**CITY OF KODIAK, a Municipal Corporation, Defendant.**

**Civ. No. A–5211.**

District Court, Alaska
Third Division, Anchorage.
June 22, 1955.

James M. Fitzgerald, Asst. U. S. Atty., Anchorage, Alaska, for plaintiff.

Buell A. Nesbett, of McCutcheon & Nesbett, Anchorage, Alaska, for defendant.

McCARREY, District Judge.

This is an action brought by the United States Government on behalf of certain Indian and Eskimo Natives, residents of the city of Kodiak, in equity, seeking to enjoin the city of Kodiak from foreclosing certain alleged tax liens on the real property of said Indian and Eskimo Natives lying within the corporate limits of the city of Kodiak.

The title to the real property here in question was acquired by the natives by way of restrictive deed from the townsite trustee. There are also other persons who own real property in the city of Kodiak, by virtue of like restrictive deeds, who are not parties to this action.

The plaintiff alleges that the city's action is without legal authority and contrary to an act of Congress, and seeks to have said parcels of land stricken from the tax rolls and the petition for the sale of all such property denied, and requests that the defendant, its agents, employees, and officers be permanently restrained from adding such parcels of property to any future tax rolls of the defendant. The plaintiff alleges that it has no other adequate remedy at law and that unless the defendant is enjoined from taking further action in effectuating the sale of the various parcels of property that the government will suffer irreparable damage, since the action of the city will constitute a cloud upon the title of the property held by such natives, and will involve the United States Government in a multiplicity of suits in order to clear the title to said properties in accordance with the statutory obligations of the government to its wards.

The restrictive deeds were issued under the authority of title 48 U.S.C.A. § 355a which provides as follows:

"355a. *Indian or Eskimo lands set aside on survey of townsite.* Where, upon the survey of a townsite pursuant to section 355 of this title, and the regulations of the Department of the Interior under said section, a tract claimed and occupied by an Indian or Eskimo of full or mixed blood, native of Alaska, has been or may be set apart to such Indian or Eskimo, the town-site trustee is authorized to issue to him a deed therefor which shall provide that the title conveyed is inalienable except upon approval of the Secretary of the Interior: Provided, that nothing herein contained shall subject such tract to taxation, to levy and sale in satisfaction of the debts, contracts, or liabilities of the patentee, or to any claims of adverse occupancy or law of prescription: Provided further, That the approval by the Secretary of the Interior of the sale by an Indian or Eskimo of a tract deeded to him under this section and section 355c of this title shall vest in the purchaser a complete and unrestricted title from the date of such approval."

Succinctly stated, the defendant bases its defense on the following grounds: (1) That the statute is an unconstitutional violation of the property rights of the natives; (2) That the statute wrongfully deprives the city of the power to tax; (3) That the statute provides an unconstitutional delegation of authority to the townsite trustee; (4) That the United States never had any vested interest in certain parcels of land privately owned by the natives at the time of the treaty.

Granting that the parcels of land in question were public lands, with fee simple title vested in the United States of America at the time Alaska was ceded to the United States of America, it is indisputable that the United States of America could deal with the lands in any manner it saw fit through acts of Congress, Utah Power & Light Co. v. United States, 243 U.S. 389, 404, 37 S.Ct. 387, 61 L.Ed. 791. The Congress, desiring to protect and benefit the Indians and Eskimos in the newly-acquired territory, passed the act of May 25, 1926, sec. 355a, Title 48 U.S.C.A. supra. In that act it specifically provided, in order to guarantee that the lands would remain in the possession and beneficial use of the Indian or Eskimo, that they would be non-transferable without the approval of the Secretary of the Interior, and also specifically provided that they could not be taxed or taken through taxation procedures, and could not be taken for debts or through execution procedures until after the title had passed to someone else upon approval of the Secretary of the Interior.

So far as I am able to ascertain, this is a case of first impression, although there are a number of other cases which have been tried and determined in the Territory of Alaska which are relatively germane and allied to the problems presented.

A provision somewhat similar to 48 U.S.C.A. § 355a is found in 25 U.S.C.A. § 412a. This provision was upheld against attack by the taxing authority of the State of Oklahoma, Board of Commissioners of Creek County, Okl. v. Seber, 1943, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094. The decision there was based on the relation of guardian and ward which existed between the federal government and the Indians, and the powers which the government has with respect to its Indian wards.

The defendant here contends that under Article III of the Treaty of Cession between Russia and the United States of America, dated March 30, 1867, 15 Stat. 539, 542, the civilized tribes of Alaska, among whom the defendant includes the native people of Kodiak, were classed with the white inhabitants of the Territory and that they cannot now be made wards of the government. Article III of the Treaty of Cession contains the following:

"The inhabitants of the ceded territory, according to their choice, reserving their natural allegiance, may return to Russia within three years; but if they should prefer to remain in the ceded territory, they, with the exception of the uncivilized native tribes, shall be admitted to the enjoyment of all the rights, advantages, and immunities of citizens of the United States, and shall be maintained and protected in the free enjoyment of their liberty, property and religion. The uncivilized tribes will be subject to such laws and regulations as the United States may, from time to time, adopt in regard to the aboriginal tribes of that country."

It has been held that this article, coupled with other acts of Congress, granted citizenship to the civilized tribes of Alaska, In re Minook, 1904, 2 Alaska 200. However, the granting of citizenship to Indians has been held not inconsistent with the guardian-ward relationship. Board of Commissioners of Creek County, Okl. v. Seber, supra. It has been determined that the uncivilized tribes are wards. United States v. Berrigan, 1905, 2 Alaska 442.

In distinguishing between the status of the civilized and uncivilized tribes, the defendant has pointed to the fact that the civilized tribes were considered Russian citizens, whereas the uncivilized tribes were not. Be that as it may, there is a distinct parallel between the thinking of the Russian Government of that time and our Supreme Court on the subject of the coexistence of citizenship and the guardian-ward status. The following, from the Imperial Russian Ukase of 1844, is taken from In re Minook, 2 Alaska at pages 214–216,

in the absence of a copy of the instrument itself:

"Article #3

"Of the Creoles

"Sec. 236. Children born of European or Siberian father and a native American mother, or of a native American father and a European or Siberian mother, shall be regarded as Creoles, equally with the children of these latter, of whom a special record is preserved.

"Sec. 239. The colonial authorities shall exercise special guardianship over the Creoles and their property.

"Article #4

"Of the Settled Tribes

"Sec. 249. These people are recognized by the government,—equally with all the others,—as Russian subjects. So long as they remain in the colonies they shall constitute a distinct rank of people, and shall not be entitled, by meritorious service, or for any other cause, to pass into another condition.

"Sec. 272. The Russian clergy in making converts among the natives shall use conciliatory and persuasive measures, in no case resorting to coercion.

"Sec. 273. The colonial authorities shall see that the natives are not embarrassed under pretext of conversion to the Christian faith.

"Sec. 274. Natives professing the Christian faith who, through ignorance, may transgress the ecclesiastical regulations, shall not be subject to fines and punishment,—instruction and persuasion are the only remedies in such cases.

"Sec. 276. Controversies in regard to property shall be adjusted, in the case of the tribes subject to Russia, by the local chiefs and superintendents."

The instrument from which the foregoing is taken was, in part, a grant of certain governmental functions to the Russian American Company. As can be seen, though the Russian Government may have granted citizenship to both Creole and native, the Creole was expressly considered a ward, and the native impliedly so.

Defendant's argument that Indians, once removed from the status of wards, cannot again be made wards, is not applicable here for the reason that there is no showing that the natives of Alaska, of either civilized or uncivilized tribes, have ever been treated as other than wards. To the contrary, both the legislative and executive branches of government have been treating the natives of Alaska as a special class, without regard to their ancestry at the time of the Treaty of Cession. While it is true that little was done until after the turn of the century which would clarify the status of the native people, it is equally true that Congress took little legislative notice of the existence of the Territory until the passage of the Organic Act in 1912, 37 Stat. 512, 48 U.S.C.A. § 21 et seq. In some of the legislation which was passed during the forty-five years between the Treaty of Cession and the Organic Act, the native people were treated as a special class, regardless of civilized or uncivilized status (e. g. 16 Stat. 180, July 1, 1870, 16 U.S.C.A. §§ 647, 649 notes; 28 Stat. 52, April 6, 1894; 33 Stat. 616, January 27, 1905, 48 U.S.C.A. §§ 41, 47, 161 et seq., 321 et seq.). Therefore, it is my opinion that the native peoples of the Territory, regardless of the former status of their ancestors, whether civilized or uncivilized, have, as a class, been in the past and are now being treated as wards of the United States Government.

From this, it follows that the decision of the Supreme Court in Board of Commissioners of Creek County, Okl. v.

Seber, supra, though perhaps not controlling, is strongly persuasive.

■ Based upon the presumption of the constitutionality of the statute and the failure of the defendant to overcome that presumption, coupled with the holding in the Board of Commissioners of Creek County, Okl. v. Seber, I am of the opinion and find that the statute is constitutional and a valid exercise of congressional legislative power.

As to the attack upon the tax-exempt status of the lands, another basis for the foregoing decision exists.

■ The basis of guardian and ward status was necessary to the decision in the case of Board of Commissioners of Creek County, Okl. v. Seber, supra, due to the concept of separate sovereignty which lies at the root of all relations between the states and the federal government. In the Territory of Alaska there is only one sovereign—the Federal Government.

"The government of the territories of the United States belongs, primarily, to Congress; and secondarily, to such agencies as Congress may establish for that purpose. During the term of their pupilage as territories, they are mere dependencies of the United States. Their people do not constitute a sovereign power. All political power exercised therein is derived from the General Government." Snow v. U. S., 1873, 18 Wall. 317, 319–320, 85 U.S. 317, 319–320, 21 L.Ed. 784.

"It possesses only such powers as are granted by the Congress of the United States. Its revenues, its property, and its very existence depend upon the will of Congress. It can be enlarged or annihilated at the will of Congress." Wickersham v. Smith, 1927, 7 Alaska 522, 536.

Thus, it can be seen that the government of the Territory of Alaska is but an arm of Congress, to be controlled by Congress.

■ The city of Kodiak is a municipal corporation existing under and by virtue of the laws of the Territory of Alaska.

"Municipal corporations have no inherent power of taxation. On the contrary, they possess, with respect thereto, only such power as has been granted to them by the constitution or the statutes." 16 McQuillin on Municipal Corporations, pp. 15–16.

■ Thus, the Alaskan municipal corporation is controlled by Congress.

"The only powers to be exercised by the municipal corporations in the Territory of Alaska must be provided by Congress, and only such powers as are so expressly delegated or necessary to carry into effect those expressly granted may be exercised." Town of Fairbanks v. Independent Meat Market, 1910, 4 Alaska 147.

■ A necessary corollary to the power to grant governmental functions to a subsidiary government is the power to limit such a grant. Municipal corporations in the Territory of Alaska have the power to tax by virtue of 48 U.S.C.A. § 44. The exemption provision found in 48 U.S.C.A. § 355a constitutes a limitation upon the power to tax previously granted to municipal corporations and, as such, is a valid exercise of the power of Congress over Alaskan municipal corporations.

■ Defendant further contends that as to some of the property, the government had no title to convey. This raises the question of the jurisdiction of the townsite trustee over the land in question. Article II of the Treaty of Cession provides in part:

"In the cession of territory and dominion made by the preceding article, are included the right of property in all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices which are not private individual property."

From this it is apparent that property which could be classed as "private individual property" did not pass as public lands. Thus, such land as was "private individual property" at the time of the Treaty of Cession and has continued to be such would not be within the jurisdiction of the townsite trustee. King v. McAndrews, 8 Cir., 1901, 111 F. 860, 863–864.

During the course of the trial, the defendant called one William or Willie A. Anderson, Sr., now owner of lot 8 in block 18 of the Kodiak Townsite, who testified that the only type of deed that he could obtain from the townsite trustee was a restrictive form of deed, although he had requested an unrestricted deed. He further testified that his father had obtained a quitclaim deed (defendant's exhibit E) to this property from one Leonidas Volkoff on the 25th day of April 1889 known as lot 59, which is identifiable upon a plat which was admitted in evidence as defendant's exhibit I, which is a copy of a print traced by an engineer on the 8th day of November 1946 of the Naval Air Station at Kodiak, Alaska, of the military reservation of Fort Kodiak, Alaska Territory, as of February 1869. Mr. Anderson testified that this same parcel of land was conveyed by one P. Slaksoutoff, late governor of the Russian colonies in America, to Leonidas Volkoff on the 24th day of April 1868 (see defendant's exhibit E); that he was born upon this property and inherited the same from his mother, Mary Anderson, as evidenced by a will dated the 3rd day of February 1921 (defendant's exhibit G) which bequeathed all of her property, both real and personal, as well as mixed, to her son, Willie A. Anderson, although the evidence will reveal that such will had never been probated.

One William J. Robertson was also called as a witness, who testified that he owned lot 16, block 10, that is identifiable by plaintiff's exhibit No. 2, which is a plat of Kodiak Townsite, U. S. Survey No. 2537(b) as surveyed by F. W. Williamson, Cadastral Engineer, G.L.O.,

from July 24 to November 12, 1940, and that title to this property was likewise held by him through restrictive deed, while, at the same time, he had purchased this lot from one Ben Craft. There was no evidence of Craft's prior title nor of the deed which Mr. Robertson had to this parcel from Mr. Craft admitted in evidence.

Both Mr. Anderson and Mr. Robertson are of part native Aleut descent. However, I place no significance upon the degree of native blood any of the property holders may or may not have, for the reason that Mr. Charles H. Jones, Area Realty Officer for the Alaska Native Service, called as the first government witness, testified that it had been the practice of his office and the Bureau of Land Management and their officers, including the township trustee, not to convey property to anyone having less than $\frac{1}{16}$ native blood, although it was his opinion, and that of his office, that Congress had not limited the Department of the Interior, or the township trustee, to any particular degree of native blood necessary before they could convey land to natives under the provisions of a restrictive deed since no blood-degree limitation is a condition of the statute, 48 U.S. C.A. § 355a, supra.

I find that lot 8 in block 18 of the Kodiak Townsite now owned by Mr. William or Willie A. Anderson, Sr., is not private individual property owned by him or his progenitors, for the reason that the treaty concerning the cession of the Russian possessions in North America, which was signed on the 30th day of March 1867 by the respective parties, and which was thereafter ratified by the United States on May 28, 1867, and the ratifications exchanged on June 20, 1867, and the proclamation thereof made by the United States on the same date under Article I, which provided as follows:

"Territory ceded. His Majesty the Emperor of all the Russias agrees to cede to the United States, by this convention, immediately upon the exchange of the ratifications thereof, all the territory and domin-

ion now possessed by his said Majesty on the continent of America and in the adjacent islands * * *."

and Article 2, which provides as follows:

"Public property ceded. In the cession of territory and dominion made by the preceding article, are included the right of property in all public lots and squares, vacant lands, and all public buildings, fortifications, barracks, and other edifices which are not private individual property. It is, however, understood and agreed, that the churches which have been built in the ceded territory by the Russian government, shall remain the property of such members of the Greek Oriental Church resident in the territory, as may choose to worship there. Any Government archives, papers and documents relative to the territory and dominion aforesaid, which may now be existing there, will be left in the possession of the agent of the United States".

and Article 4, which is as follows:

"Formal delivery. His Majesty, the Emperor of all the Russias shall appoint, with covenient despatch, an agent or agents for the purpose of formally delivering to a similar agent or agents appointed on behalf of the United States, the territory, dominion, property, dependencies and appurtenances which are ceded as above, and for doing any other act which may be necessary in regard thereto. But the cession, with the right of immediate possession, is nevertheless to be deemed complete and absolute on the exchange of ratifications, without waiting for such formal delivery."

and Article 6, which is as follows:

"Payment: Effect of cession. In consideration of the cession aforesaid, the United States agree to pay at the Treasury in Washington, within ten months after the exchange of the ratifications of this convention, to the diplomatic representative or other agent of His Maj-

esty the Emperor of all the Russias, duly authorized to receive the same, seven million two hundred thousand dollars in gold. The cession of territory and dominion herein made is hereby declared to be free and unincumbered by any reservations, privileges, franchises, grants, or possessions, by any associated companies, whether corporate or incorporate, Russian or any other, or by any parties, except merely private individual property-holders; and the cession hereby made, conveys all the rights, franchises, and privileges now belonging to Russia in the said territory or dominion, and appurtenances thereto.

"Ratification. When this convention shall have been duly ratified by the President of the United States, by and with the advice and consent of the Senate, on the one part, and on the other by His Majesty the Emperor of all the Russias, the ratifications shall be exchanged at Washington within three months from the date hereof, or sooner, if possible." Treaty concerning the cession of the Russian possessions in North America, vol. I, pages 35–38, 1949 Alaska Compiled Laws Annotated.

precluded P. Slaksoutoff, the late governor of the Russian colonies in America, from conveying title to any property at Saint Paul's Harbor, Kodiak Island, on the 25th day of April 1868 for the reason that, as between the parties, a treaty takes effect, in the absence of any provision to the contrary, from the time it is signed, with its subsequent ratification relating back to that date; but in its application to private rights, a treaty is effective only from the exchange of ratifications. 87 C.J.S., Treaties, § 14, p. 941.

I further find that the city of Kodiak has failed to prove that William J. Robertson obtained private individual property rights to lot 16 in block 10 of the Kodiak Townsite through the pur-

chase of said property from Ben Craft in 1938.

In conclusion, I find that the defendant is without power to tax the parcels of land here in question, and that the plaintiff is entitled to the equitable relief prayed for in its complaint. I, therefore, order that the parcels of land conveyed by restrictive deeds to certain residents in the city of Kodiak by the township trustee, and which are on the city of Kodiak's petition for sale pending before this court for their failure to pay the taxes assessed by the city of Kodiak thereon, be stricken from said petition of sale, and, further, order that the defendant, city of Kodiak, its agents, employees and officers be permanently enjoined and restrained from placing such parcels of land as are held by such restrictive deeds upon any future tax rolls.

I further find that each party shall bear its own respective court costs and attorneys' fees.

Findings of fact, conclusions of law and a decree shall be prepared by the Government, in accordance herewith.