The Honorable Cecile Bledsoe State Representative P.O. Box 2457 Rogers, AR 72757-2457
Dear Representative Bledsoe:
I am writing in response to your request for my opinion on the following questions:
1. Can property be taxed if the land patent is current?
2. Are the following opinions correct?
 Article 2, Section 28 of the Arkansas state Constitution provides:" All lands in this State are declared to be allodial; and feudal tenures of every description, with all their incidents, are prohibited." I hereby reassert all my rights under said provision. I am not a tenant. Please note the following:
"Allodial" means not beholden to any superior. Black's Law Dictionary.
 Unrestricted allodial property is not subject to local taxation. U.S. v. City of Kodiak, 132 F.Supp. 574 (1955).
 "That the patent carries the fee and is the best title known to a court of law is the settled doctrine of the court." Marshall v. Ladd, 74 U.S. 106.
 "A patent is the highest evidence of title, and is conclusive, against the government and all claiming under junior titles, until it is set aside or annulled by some judicial tribunal." Stone v. U.S., 67 U.S. 765.
 "Issuance of a government patent granting title to land is `the most accredited type of conveyance know[n] to our law.[`]" U.S. v. Creek Nation, 295 U.S. 103-111. See also U.S. v. Cherokee Nation, 474 F2d 628, 634.
 A Patent issued by the United States so vests the title in the lands covered thereby, that it is the further general rule that, such patents are not open to collateral attack. Thomas v. Union Pacific Railroad Company (1956). (See also State v. Crawford, 475 P.2d 515 (Ariz.App. 1970. A patent is prima facie valid, and if its validity can be attacked at all, the burden of proof is upon the party seeking to upset the patent.)
 See State v. Crawford, 441 P.2d 586, 590 (Ariz.App. 1968) (A patent to land is the highest evidence of title and may not be collaterally attacked).
 In Hooper et al. v. Scheimer, 64 U.S. (23 How.) 235 (1859), the United States Supreme Court stated," I affirm that a patent in unimpeachable at law, except, perhaps, when it appears on its own face to be void; and the authorities on this point are so uniform and unbroken in the courts, Federal and State, that little else will be necessary beyond a reference to them." Id. at 240 (1859).
 Courts of equity cannot set aside, annul, or correct patents or other evidence of title obtained from the United States by fraud or mistake, unless on specific averment of the mistake or fraud, supported by clear and satisfactory proof. Maxelli Land Grant Cancellation, 11 How. (U.S. 552 (1850).
 A collateral attack to a land patent must be brought in the original land patent proceedings. Sumna Corporation v. California ex rel. State Lands Commission, etc., 80 L.Ed.2d 237 (1984).
Conclusion: Land cannot be taxed if a land Patent is current.
Because answering your first question will entail considering the propositions set forth in your second question, I will address the two together.
RESPONSE
In my opinion, the state can clearly impose property tax on government property that has been conveyed to a private party by land patent. Based on the opinions expressed in your second question, I assume that your phrase "the land patent is current" refers to the practice of individuals filing documents in the land records asserting their supposed "patent" interest in property. In my opinion, such filings have no legal significance other than possibly to cloud title to property without any legal justification. I disagree with the proposition that "allodial" property is not subject to taxation, and I do not believe the filing of any purported "patent" can relieve a property owner of the obligation to pay property taxes.
As you note in your request, Ark. Const. art. 2, § 28 provides: "All lands in this State are declared to be allodial; and feudal tenures of every description, with all their incidents, are prohibited." Black's LawDictionary (7th ed. 1999) offers the following pertinent definitions:
allodial: Held in absolute ownership; pertaining to an allodium.
allodium: An estate held in fee simple absolute.
 In this country, one who has full ownership of land is said to own it allodially — that is, free of feudal services and incidents." Thomas F. Bergin Paul G. Haskell, Preface to Estates in Land and Future Interests 18 (2d ed. 1984).
This definition invites analysis in light of the following discussion in 1 D. Thomas, Thompson on Real Property § 4.06, at 155-57 (Thomas ed. 1994):
 Students of the common law are told that the fee simple absolute is the greatest estate in land known to the common law, and that its two chief characteristics are inheritability and alienability. The precise etymology of the term "fee" is uncertain, but it is obviously related to other terms signifying the feudal relationship, such as enfeoffment. In the medieval era, a holding in fee was a feudal holding, that is, subject to the rights and restrictions of feudal tenures; under the terms of these tenures enjoyment of land was conditioned upon rendering various services and payments to a superior owner. Thus ownership in fee could be contrasted with "allodial" ownership, by which one held free of any other owner's restrictions or concurrent rights, except the sovereignty of the state.
* * *
 . . . The fee simple of the thirteenth century was unlike the modern fee simple, mostly because the medieval estate consisted only of a set of feudal dues and responsibilities (all related to and burdening the land, of course), whereas the modern fee is simply full ownership subject to a less onerous set of sovereign prerogatives.
This historical summary, which strikes me as fully consistent with theBlack's Law Dictionary definition, suggests that the medieval notion of allodial ownership has merged with the modern notion of ownership in fee simple absolute, signifying absolute ownership in the fee holder, subject to no feudal incidents but nevertheless qualified by certain continuing sovereign prerogatives.
Having tentatively ventured this conclusion, I should note the existence of differing authority regarding the meaning of allodial title. In the course of extensively analyzing just what property interest, if any, is conveyed by the issuance of a "land patent," the court in Britt v.Federal Land Bank Association of St. Louis, 505 N.E.2d 387, 392
(Ill.App. 1987), drew the following distinction between allodial title and fee simple title:
 Under common law tradition, all private titles since Norman times have originated from title held by the sovereign. (1 Tiffany, The Law of Real Property § 13 (2d 3d. 1920).) The seminal opinion in American jurisprudence analyzing the origin of sovereign titles and setting forth the principles by which conflicting title claims based upon competing sovereignties [sic: verb missing] was authored by Mr. Chief Justice Marshall in Johnson Graham's Lessee v. M'Intosh (1823), 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681. There, Chief Justice Marshall outlined the means by which sovereigns acquire title (conquest, cession and treaty) and stated that by the Treaty of Paris in 1783:
 "[T]he powers of government, and the right to soil, which had previously been in Great Britain, passed definitively to the states." Johnson Graham's Lessee v. M'Intosh (1823), 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681, 691.
 This sovereign title, which is absolute and encompasses both ownership of the land and the right to govern the inhabitants thereof, is "allodial" title. This term is used in contradistinction to the term "fee simple title," which contemplates the highest title which may be privately held. (1 Tiffany, The Law of Real Property §§ 6 and 13 (2d ed. 1920).) In current usage, the holder of fee simple title is still subject to dispossession by the government, through due process of law, for nonpayment of real estate taxes and by eminent domain proceedings.
Regardless of which of these definitions of allodial title one accepts — either that it represents the equivalent of fee simple title or that it represents the government's overarching interest in property within the range of its governance — I believe the government is clearly invested with the right to tax private real property.
As the foregoing should suggest, I disagree with the apparent assumption underlying your request that "allodial" ownership locates property beyond the range of government control, including through taxation. In Wash. Op. Att'y Gen. No. 96-006, my counterpart from the state of Washington addressed a request similar to yours involving a property owner's claim to be exempt from property taxation by virtue of his alleged status as the holder of an "allodial freehold estate." By way of background, the Washington Attorney General reported:
 The . . . property owner filed a declaration of homestead upon the county records. He attached to that declaration a document entitled "Declaration of Assignee's Update of Patent." The "Declaration" consists of a description of the property, followed by a long recitation of what the property owner apparently believes to be recognized as legal principles regarding land patents.[1] Also attached was a copy of what is described as the original land patent from the United States.
My counterpart offered the following analysis in rejecting the property owner's claim to be exempt from taxation as the holder of a patent on an allodial freehold:
 The legal concept of holding land by "allodial freehold" or" in allodium" traces to the feudal roots of the English system of land tenure. As it operated at the height of the middle ages, feudalism involved a descending pyramid of lords and vassals. The monarch granted tenure to tenants in chief, who in turn often granted portions of their estates to others. Those lower on the pyramid owed certain obligations, in the form of military service, cash, crops, or other services, to the higher lord. This system generated the revenues and services with which the monarch financed the expenses of government and maintained an army. C. Moynihan, Introduction to the Law of Real Property 1-8 (2d ed. 1988).
 . . . The distinction between property held subject to tenure and in allodium has long since been derogated to mere academic interest. The obligations owed by vassals to their lords, such as providing the services of a particular number of knights, were gradually superseded as society modernized. While concepts of land tenure were initially imported to the American colonies, as evidenced by original royal land grants, such concepts have been abolished with [sic] all land, long since held free of feudal obligation. Moynihan, supra, at 18-23.
 There is no reason to conclude that the concepts of feudal landholding, including that of the allodial freehold, bear any current relevance to the payment of property taxes. Our state constitution provides for a uniform power of taxation as to all property. Const. art. 7, § 1. . . . There can, therefore, be no question but that property taxes can be imposed without regard to whether the subject real estate can be described as allodial.
(Footnotes omitted.)
Although the Arkansas Supreme Court has never found occasion to address the issue,[2] I feel confident that it would agree in all respects with the Washington Attorney General's analysis. Significantly, Ark. Const. art. 16, § 5, like the Washington constitutional provision referenced in the passage just quoted, expressly provides for the taxation of real property, indicating that the drafters of our constitution saw no contradiction in the concept of taxing "allodial freeholds." This harmony between the concepts of allodial ownership and taxability is reflected in the following summation by the Maryland Supreme Court:
 After the close of the Revolutionary War, the ownership of property in this country has frequently been referred to as "allodial" in nature or that the property is held by "allodial tenure." In its strict sense, "allodium" means land owned absolutely, and not subject to any rent, service, or other tenurial right of an overlord; however, it has been, and is, uniformly recognized throughout this country that the ownership of property is subject to the rights of government to tax the property, to regulate reasonably its use and enjoyment under the police power of the States, and to take the same, upon payment of the value thereof, when needed for a public purpose.
City of Annapolis v. Waterman, 745 A.2d 1000, 1006-07 (Md. 2000). My own research suggests that the Maryland court's summation of the law is totally accurate: I have been unable to locate a single instance in which any court in any jurisdiction has held that real property is exempt from taxation by virtue of its allodial character.
Specifically with respect to the relationship between patents and taxability, the Maryland Supreme Court has more recently observed:
 Through the relationship between the states and the federal government in the post-revolutionary era, the Lord Proprietor's successors, the states, became vested with the right to grant and patent titles to land to the citizens, a process that continues. The grants and patents are subject to the requirement that the created title to property be subject to charges on the land and that the title owners, and their successors, pay such taxes or charges on the land so granted, as the states from time to time, deem necessary for the proper functioning of government. The land itself is subject to taxes. If the taxes are not paid, the title to the land through the tax sale process is granted and titled anew to the tax sale purchaser.
Lippert v. Jung, 783 A.2d 206, 217 (Md. 2001).
As this passage suggests, a land patent is a conveyance of public land to private ownership; it is not a "declaration" by a private individual faced with a mortgage or tax lien that he owns an indefeasible interest in property by patent. Given this distinction, courts have been understandably impatient when defendants before or after judgment cloud title to property by filing bogus "declarations of patents." This judicial attitude is demonstrated in Britt, supra, in which the appellants filed various "land patents" and then sued to quiet title in property they had lost to foreclosure. After characterizing the plaintiffs' briefs as "nothing more than a compilation of disjointed and nonsensical claims and legal conclusions totally unsupported by citations to the record or relevant legal authority," 505 N.E.2d at 389, the court offered the following analysis:
 [T]he courts of other States and the Federal courts have spoken to the issue of the legal sufficiency of "land patents." These courts have rendered decisions upon a variety of issues based upon facts similar to the case at bar, where plaintiffs in a suit to quiet title filed a document described as a land patent and claimed superior title to that of the purchaser at the judicial sale of the property. Hilgeford v. Peoples Bank (7th Cir. 1985), 776 F.2d 176; Hilgeford v. Peoples Bank
(N.D.Ind. 1985), 607 F.Supp. 536; Nixon v. Phillipoff (N.D.Ind. 1985), 615 F.Supp. 890; Federal Land Bank v. Gefroh (N.D. 1986), 390 N.W.2d 46; Timm v. State Bank (Minn.App. 1985), 374 N.W.2d 588; Wisconsin v. Glick (7th Cir. 1986), 782 F.2d 670. Because of the lack of Illinois case law on what appears to be a procedure without legal foundation in Illinois, we find the analysis of Judge William C. Lee of the U.S. District Court for the Northern District of Indiana in Hilgeford v. Peoples Bank (Hilgeford v. Peoples Bank
(N.D.Ind. 1985), 607 F.Supp. 536) instructive. There, as here, the plaintiffs attempted to establish superior title to the property foreclosed upon by their mortgagee, the Peoples Bank. Judge Lee observed:
 The "patent" involved here is not a grant by the United States; it is a grant by the plaintiffs. The "patent" here is not a grant to some other holder so as to pass title on to another party; it is a self-serving document whereby the plaintiffs grant the patent to themselves. This "patent" does not involve or concern "public land"; it relates to plaintiffs' private property. The court cannot conceive how these federal provisions are implicated here, and thus federal question jurisdiction is absent.
 Of course, the purported "land patent" in this case fails for reasons independent of jurisdiction. As was noted before, the "land patent" attached to plaintiffs' various filings is a grant of a land patent from the plaintiffs to the plaintiffs. It is, quite simply, an attempt to improve title by saying it is better. The court cannot conceive of a potentially more disruptive force in the world of property law than the ability of a person to get "superior" title to land by simply filling out a document granting himself a "land patent" and then filing it with the recorder of deeds. Such self-serving, gratuitous activity does not, cannot and will not be sufficient by itself to create good title.
505 N.E.2d at 390, quoting 607 F. Supp. at 538-39.
The court in Britt summarized as follows the effect of a legitimate conveyance of property by land patent:
 What is totally incorrect is the implicit foundation of the Britts' position: that the land patent issued to "James Evans" and "Francis Evans" in 1841 conveyed the entire title of the Federal government, such that no interest arising by operation of State law can attach to the title.
 A land patent is merely the deed by which the government passes fee simple title of government land to private persons. (63 Am.Jur.2d Public Lands § 70 (1984).) Once fee simple title is passed to an individual from the government, whether by land patent or otherwise, claims arising from conveyance or mortgage by that holder will be enforced against him. (Cf., Stark v. Starr (1876), 94 U.S. (4 Otto)477, 24 L.Ed. 276; United States v. Budd (1891), 144 U.S. 154, 12 S.Ct. 575, 36 L.Ed. 384; see also 63A Am.Jur.2d Public Lands § 92 (1984).) Where, as here, a decree of foreclosure and sale has divested title from the former mortgagor, the mere fact that the mortgagor's claim of title may run directly back through his family to a 19th
century patent is of no consequence.
505 N.E.2d at 392.
The court in Britt, like the court in Hilgeford, was so incensed by the filing of bogus "perfected patents" designed to cloud title to property that it imposed significant sanctions in the form of attorneys' fees both below and on appeal. Id. at 393-94. It further advised the prevailing defendant to consult the supreme court should it elect to pursue disciplinary action against plaintiffs' counsel for filing an obviously frivolous claim. The court quoted with obvious agreement the following attribution of motive for such bogus filings offered by the Seventh Circuit Court of Appeals in Wisconsin v. Glick, 782 F.2d 670, 671-72 (7th Cir. 1986):
 People saddled with mortgages may treasure the idea of having clean title to their homes. The usual way to obtain clean title is to pay one's debts. Some have decided that it is cheaper to write a "land patent" purporting to convey unassailable title, and to file that "patent" in the recording system.
In my opinion, a reviewing Arkansas court would apply this same analysis, possibly accompanied by sanctions of the sort discussed above, to an individual who sought to defeat a property tax lien by filing in the land records a purported declaration of patent.
With respect to the list of legal propositions set forth in your second question, I have the following remarks. First, nothing in any of the propositions dealing with the effect of land patents even remotely suggests that a conveyance of public land by land patent will preclude the government from imposing property tax on the land. Second, despite the contrary suggestion set forth in your request, U.S. v. City ofKodiak, 132 F. Supp. 574 (D.C. Terr. of Alaska 1955), does not hold that "[u]nrestricted allodial property is not subject to local taxation." Regardless of whether allodial title is deemed coextensive with fee simple title, under any reading of the term it will never be "unrestricted," given that the government retains various sovereign prerogatives, including the power to tax the property. Moreover, the ruling in Kodiak has nothing to do with the taxation of allodial property. The case stands only for the proposition that a municipal court cannot impose a tax on property that Congress, in its role as territorial sovereign and guardian over certain Alaskan Indian and Eskimo natives, has expressly exempted from taxation.
My reading of Ark. Const. art. 2, § 28 essentially tracks one offered by the Wisconsin Supreme Court in interpreting a materially indistinguishable provision of the Wisconsin Constitution:
 Article I, sec. 14, of the Wisconsin Constitution provides in pertinent part: "All lands within the state are declared to be allodial, and feudal tenures are prohibited. . . ."
 In Mutual Fed. S. L. Asso. v. Wisconsin Wire Wks., 58 Wis.2d 99, 108
n. 1, 205 N.W.2d 762, 767 (1973), appeal after remand, 71 Wis.2d 531, 239 N.W.2d 20 (1976), the court explained the meaning of art. I, sec. 14:
 It appears that sec. 14 of art. I was added to the Wisconsin Constitution for the purpose of establishing that ancient principles of feudal property law are inapplicable within this state. In Barker v. Dayton (1871), 28 Wis. 367, the court was called upon to define the term "allodial," which appears in the provision. With respect to that term the court said, at pages 384, 385:
 Taken in such connection, it means little more than if the framers had said "free," or "held in free and absolute ownership," as contradistinguished from feudal tenures, which are prohibited in the same sentence, and by the very next words, and the prohibition of which, with their servitudes and reservations, and all the attendant hindrances and obstacles in the way of free and ready sale and transfer of real property, constituted the chief object of the provision.
 Article I, sec. 14, of the Wisconsin Constitution protects against the establishment of feudal tenures because that system of land ownership prevented easy transfer of land. It does not prohibit Dane County from taxing the Every's land, nor from taking a tax deed if real estate taxes are not paid, nor from evicting the Everys from Dan County's real estate.
In my opinion, if faced with the issue, the Arkansas Supreme Court would construe Ark. Const. art. 2, § 28 in precisely this manner.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MARK PRYOR Attorney General
MP:JD/cyh
[1] The mantric tone of a typical "declaration of patent" is illustrated by one addressed in Federal Land Bank of Spokane v. Redwine,755 P.2d 822-23 (Wash. 1988), in which the Washington Supreme Court affirmed a trial court's grant of summary judgment rejecting a property owner's claim that his declaration necessarily defeated his mortgagee's effort to foreclose:
 I bring up this Land Patent or Grant in my name, as it is the only way a paramount, allodial and perfect title can be had in my name. . . . If this Land Patent is not challenged by someone in a court of law within 60 days from the date of this filing, then the above described property shall become mine as an allodial freehold.
In addressing the claims of "constitutionalist" groups prone to misrepresent the nature of allodial ownership, one commentator has remarked:
 Many of the documents submitted by the groups indicate a belief that the civil and criminal justice systems operate on the basis of magic words or mystic documents and all that one must do to make the government or his opponent cease is to say the magic words or to send the mystic documents.
Lawrence G. Wasden, Constitutionalist Groups Misrepresent Both Fact andLaw, Advocate 8, 9 (Idaho 1996). This belief was amusingly demonstrated by a married couple who resisted an effort to liquidate secured collateral in their federal bankruptcy action by filing in state court the following "Constructive Notice and Demand," including among the defendants the bankruptcy judge:
 That Deponents hereby DEMAND that you, and each of you, CEASE AND DESIST from any further unlawful acts with respect to Deponents' persons and property.
 That any attempts to Hinder, Obstruct, harass or Interfere with Deponents' said Allodial Freehold Property Rights, will result in criminal and civil charges being initiated against the offending parties in a court, at Law, with competent jurisdiction.
Apparently duly intimidated, the bankruptcy judge honored the allodial freeholders' demand to stop meddling in their affairs: he dismissed their petition in bankruptcy, leaving them to the tender mercies of their now unrestrained creditors. In re Lehs, 48 Bankr. 469, 470 (Bankr. N.D. Iowa 1985).
[2] Indeed, the court has referred to Ark. Const. art. 2, § 28, which contains the reference to "allodial" property, on only one occasion, and then merely to remark in passing that the provision did not bear on the disputed issue. Funk v. Dyess Colony, Inc., 200 Ark. 180, 191,139 S.W.2d 12 (1940).